## PAYNE *v.* ROBERTSON.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF OKLAHOMA.

No. 20. Submitted January 17, 1898. — Decided February 28, 1898.

A deputy marshal of the United States, duly appointed as such prior to the passage of the act of March 2, 1889, c. 412, providing for the opening of the Territory of Oklahoma to settlement, and prior to the proclamation of the President of March 23, 1889, fixing the time of the opening of the lands for settlement, and who entered on said lands and remained there in his official character prior to the day fixed for said opening, was thereby disqualified from making a homestead entry immediately upon the lands being opened for settlement.

PAYNE, the appellant here, filed his bill of complaint in the District Court for the county of Logan and Territory of Oklahoma, First Judicial District, against the present appellees. It was averred in the bill that prior to the passage of the act of Congress of March 2, 1889, providing for opening the Oklahoma lands for settlement, the complainant had been

duly appointed and qualified as a deputy marshal of the United States, and that after the proclamation of the President, on March 23, 1889, declaring that said lands would be open to settlement after noon of the 22d of April, 1889, complainant, in pursuance of orders of his superior officer, the marshal of the United States for the District of Kansas, went into the Territory, to the locality where the United States land office at Guthrie was located, for the purpose of preserving public order. That being rightfully in said Territory and possessed of all the qualifications required by the act of Congress to authorize an entry of lands in such Territory for the purpose of a homestead, complainant, after twelve o'clock noon of said April 22, 1889, settled upon a named quarter section of land, at once commenced digging a well thereon, and claimed the same as his homestead, and that on the next day he duly entered said tract of land at the United States land office in Guthrie, paid the necessary charges and expenses connected with such entry, and thereafter fully complied with all other requirements of the homestead law. Though the bill averred that at the time of his going into the Territory to perform the duties of deputy marshal, complainant "had formed no purpose or intention in regard to selecting and taking a homestead when said lands should be duly opened to settlement," nevertheless it was averred elsewhere in the bill, that in reliance on certain opinions and assurances of the Commissioner of the General Land Office and the Secretary of the Interior, claimed to have been communicated to parties similarly situated as was the complainant, to the effect that persons so situated were not disqualified from entering a homestead when the lands became opened to settlement, complainant remained in the Territory and made the settlement in question. It was further averred that, subsequent to such entry and settlement, the defendant Fitzgerald went upon and claimed said tract of land as a homestead, and that other parties, by force and against the notice and warning of the complainant, proceeded to stake off and occupy a large portion thereof as a townsite in violation of law and of the prior superior homestead rights of the complainant. It was also averred

that on May 9, 1889, the townsite claimants instituted proceedings in the United States land office at Guthrie, Oklahoma, to obtain a cancellation of the homestead entry of complainant, and that ultimately such entry was cancelled, the Secretary of the Interior approving the action of the Commissioner of the General Land Office in ordering such cancellation, on the ground that complainant was disqualified by his presence in the Territory prior to the time fixed in the proclamation of the President, from making the entry. It was further averred that subsequently the Secretary of the Interior, in pursuance of the provision of the act of May 14, 1890, c. 207, appointed the defendants Robertson, Foster and Schnell to prove up and enter the tract of land claimed for a townsite, in trust for the inhabitants of a town to be called East Guthrie, and that after final entry by such trustees a patent of the United States' was duly issued to them, which it was claimed vested in said defendants the legal title to the land covered by the patent.

In conclusion, complainant averred that he had done all things required by law in order to be entitled to a final patent, and that he was the equitable owner of the land claimed by him; that the Secretary of the Interior had misapplied and misconstrued the law in cancelling the entry of complainant; and he prayed that the townsite trustees might be divested of the legal title to the tract in question and it be vested in complainant. The bill was demurred to upon various grounds, and the demurrer being sustained a decree was thereupon entered dismissing the bill. On appeal, this decree was affirmed by the Supreme Court of the Territory, and from the decree of affirmance an appeal was taken to this court.

*Mr. Henry N. Copp, Mr. S. D. Luckett, Mr. John W. Daniel* and *Mr. Amos Green* for appellant.

*Mr. Solicitor General, Mr. Horace Speed* and *Mr. Bayard T. Hayner* for appellees.

Mr. Justice White, after stating the case as above reported, delivered the opinion of the court.

In sustaining the demurrer the lower courts passed upon but one of the grounds stated therein, namely, that which asserted that the complaint did not set forth a cause of action. This contention went to the merits of the case and called for a decision of the question whether the Secretary of the Interior, upon the facts found by him, properly held that Payne was disqualified from making his alleged entry. As this is the pivotal point in the case and its decision is free from difficulty, we shall confine ourselves, in this opinion, to its consideration.

The ruling of the Secretary of the Interior that the settlement made by complainant was invalid is averred in the bill to have been based upon the following finding of facts:

"Ransom Payne made homestead entry for the N. W. ¼ of section nine (9) on April 23, 1889. Said Ransom Payne was a United States deputy marshal, duly appointed prior to the passage of the act of March 2, 1889, (16 C. L. O. 10, 11,) providing for the opening of the Territory of Oklahoma to settlement, and prior to the proclamation of the President fixing the day for said opening, and he entered said Territory prior to April 22, and was there at noon of that day in obedience to orders issued by his superior officer, and he was there in the discharge of his official duties. Immediately after 12 o'clock noon of April 22 he went upon the land in question and commenced to dig a hole in the ground for a well, and as soon as practicable appeared at the local office and made his entry. So far as his age, citizenship, etc., are concerned he was a qualified homestead claimant, and he bases his claim upon his prior settlement."

The statute which it is claimed was misconstrued and misapplied by the Secretary of the Interior in his decision sustaining the cancellation of Payne's entry, is that portion of section 13 of the Indian appropriation act approved March 2, 1889, c. 412, 25 Stat. 980, 1004, which, after stipulating for the disposal of lands acquired from the Seminole Indians to actual settlers under the homestead laws only, except as therein otherwise provided, declared that "until said lands are opened for settlement by proclamation of the President, no person

shall be permitted to enter upon and occupy the same, and no person violating this provision shall ever be permitted to enter any of said lands or acquire any right thereto." It was also claimed that the Secretary misconstrued and misapplied the proclamation of the President of date March 23, 1889, 26 Stat. 1544, fixing the time for the opening of the lands for settlement, particularly that portion which reads as follows:

"Now, therefore, I, Benjamin Harrison, President of the United States, by virtue of the power in me vested by said act of Congress, approved March second, eighteen hundred and eighty-nine, aforesaid, do hereby declare and make known, that so much of the lands, as aforesaid, acquired from or conveyed by the Muscogee (or Creek) Nation of Indians, and from or by the Seminole Nation of Indians, respectively, as is contained within the following-described boundaries, viz. : . . .

"Will, at and after the hour of twelve o'clock, noon, of the twenty-second day of April, next, and not before, be open for settlement, under the terms of, and subject to, all the conditions, limitations and restrictions contained in said act of Congress, approved March second, eighteen hundred and eighty-nine, and the laws of the United States applicable thereto. . . .

"Warning is hereby again expressly given, that no person entering upon and occupying said lands before said hour of twelve o'clock, noon, of the twenty-second day of April, A.D. eighteen hundred and eighty-nine, hereinbefore fixed, will ever be permitted to enter any of said lands or acquire any rights thereto; and that the officers of the United States will be required to strictly enforce the provision of the act of Congress to the above effect."

The question presented is, therefore, solely this: Was the complainant disqualified by reason of his entry into the Territory and his presence there at the hour of the opening of the Territory for settlement, under the circumstances stated in the finding of the Secretary, from making a homestead entry immediately upon the lands being opened for settlement?

This question is governed by the case of *Smith* v. *Townsend*, 148 U. S. 490. The point there presented was whether a

railroad section hand, residing with his family on a railroad right of way within the Territory, and who by reason of his employment and residence was present therein at the hour of noon on April 22, 1889, could immediately thereafter legally enter upon public land adjoining said right of way and claim the same as a homestead. A construction was rendered necessary of the second section of the act of March 1, 1889, c. 317, 25 Stat. 757, 759, ratifying and confirming an agreement with the Muscogee (or Creek) Indians, whereby a large body of their lands, subsequently included in the Territory of Oklahoma, had been ceded to the United States. The section referred to declared the ceded land to be part of the public domain and subject to homestead entry. The concluding sentence of the section read as follows:

"Any person who may enter upon any part of said lands in said agreement mentioned prior to the time that the same are opened to settlement by act of Congress shall not be permitted to occupy or to make entry of such lands or lay any claim thereto."

A construction was also required of the substantially similar provision contained in the act of March 2, 1889, heretofore quoted, and of the "warning" notice contained in the proclamation of March 23, 1889, which we have also heretofore referred to. To aid in construing these provisions resort was had to the history of the times, in order to ascertain the reason of the statutes as well as their meaning, and the conclusion was deduced (p. 496) that the purpose of the legislative provisions referred to was "to secure equality between all who desired to establish settlements in that Territory. The language is general and comprehensive: 'Any person who may enter upon any part of said lands . . . prior to the time that the same are opened to settlement . . . shall not be permitted to occupy or to make entry of such lands or lay any claim thereto.' 'Until said lands are opened for settlement by proclamation of the President, no person shall be permitted to enter upon and occupy the same, and no person violating this provision shall ever be permitted to enter any of said lands, or acquire any right thereto.' No excep-

tion is made from the general language of these provisions; and it was evidently the expectation of Congress that they would be enforced in the spirit of equality suggested by the generality of the language."

And, again, at page 500, the court observed:

"The evident intent of Congress was, by this legislation, to put a wall around this entire Territory, and disqualify from the right to acquire, under the homestead laws, any tract within its limits, every one who was not outside of that wall on April 22. When the hour came the wall was thrown down, and it was a race between all outside for the various tracts they might desire to take to themselves as homesteads."

Subsequently, conceding that Smith, the appellant in the case, was lawfully on the right of way of the railroad company, and that he possessed all the qualifications prescribed by the general homestead law, it was said (p. 500):

"He did not have the qualifications prescribed by this statute; and there is nothing to prevent Congress, when it opens a particular tract for occupation, from placing additional qualifications on those who shall be permitted to take any portion thereof. That is what Congress did in this case. It must be presumed to have known the fact that on this right of way were many persons properly and legally there; it must also have known that many other persons were rightfully in the Territory — Indian agents, *deputy marshals*, mail carriers, and many others; and, if it intended that these parties, thus rightfully within the Territory on the day named, should have special advantage in the entry of tracts they desired for occupancy, it would have been very easy to have said so. The general language used in these sections indicates that it was the intent to make the disqualifications universally absolute. It does not say 'any person who may wrongfully enter,' etc., but 'any person who may enter' — 'rightfully or wrongfully' is implied. There are special reasons why it must be believed that Congress intended no relaxation of these disqualifications on the part of those on the company's right of way, for it is obvious that, when a railroad runs through unoccupied territory like Oklahoma, which on a given day is opened for settle-

ment, numbers of settlers will immediately pour into it and large cities will shortly grow up along the line of the road ; and it cannot be believed that Congress intended that they who were on this right of way in the employ of the railroad company should have a special advantage of selecting tracts, just outside that right of way, and which would doubtless soon become the sites of towns and cities."

And in concluding its opinion the court held that " one who was within the territorial limits at the hour of noon of April 22 was, within both the letter and spirit of the statute, disqualified to take a homestead therein."

The reasoning of the opinion to which we have referred is fully applicable to the facts of the case under review ; indeed, the very character of case now presented was referred to in illustration. In accordance with the views there expressed, we must, therefore, hold that as the appellant was within the Territory just prior to, and at the moment of, time when the land first became legally open to settlement, he was disqualified at that time from entering upon and claiming lands therein as a homestead. Manifestly, Congress did not intend that one authorized to enter the Territory in advance of the general public, solely to perform services therein as an employé of the Government, should be at liberty, immediately on the arrival of the hour for opening the Territory to settlement, to assume the status of a private individual and "actual settler," and make selection of a homestead, thus clearly securing an advantage in selection over those who, obedient to the command of the President, remained without the boundaries until the time had arrived when they might lawfully enter.

*Affirmed.*