## SMITH *v.* TOWNSEND.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF OKLAHOMA.

No. 1173. Submitted March 6, 1893. — Decided April 3, 1893.

An employé of the Atchison, Topeka and Santa Fé Railroad, residing within the Territory of Oklahoma before, up to and on the 22d day of April, 1889, was thereby disabled from making a homestead entry upon the tract of land on which he was residing.

On April 30, 1891, the appellant filed his complaint in the District Court of Oklahoma County, Territory of Oklahoma. In this complaint he alleged his citizenship, and full qualification to enter public lands under the homestead laws of the United States; that during the years 1888 and 1889 the Atchison, Topeka and Santa Fé Railroad Company was engaged in operating a railroad through the Indian Territory, having a right of way therein, granted by treaty with the Indians, and acts of Congress; that during those years he was employed as a section hand by said company, and resided in a station-house belonging to it, on the right of way, at a place known as Edmond Station; that he entered into the employment of the railroad company, and continued in such employment, and commenced living at said Edmond Station without any intent to take lands within the Indian Territory, but solely to discharge his duties as an employé of the company; that when the lands surrounding said station were open to settlement, under the acts of Congress of March 1 and 2, 1889, and the proclamation of the President, of March 23, 1889, plaintiff was at said Edmond Station, and on said right of way, and soon after the hour of noon on April 22, 1889, went upon the land in controversy and settled upon it as his homestead, and with the intention to occupy and enter it as his homestead under the laws of the United States; that pursuant to such intention he built a house thereon and otherwise improved the premises, and dwelt upon it as his home, and on April 23, 1889, duly made an entry at the proper land office at Guthrie, Indian Territory; that on the 22d of June, 1889, the defendant filed in the local land office a contest, which contest was heard in such land office on the following statement of facts:

"Alexander F. Smith had been for a long time prior to March 2, 1889, in the employ of the A., T. & S. F. R. R. Co. as a section hand, and on January 30, 1889, came to Edmond, Oklahoma Territory, in that capacity, bringing his family with him. He did not enter the Territory with the expectation or intention of taking land in the Oklahoma Territory. He remained in the employ of the railroad company until noon of April 22, 1889, Santa Fé R. R. time, when he removed

his tent to a point about one hundred and fifty yards distant from the right of way of said railroad and on the land in controversy, where he put it up and moved into it. From January 30, 1889, Smith lived with his family in his tent on the right of way of the A., T. & S. F. R. R., where it passes through the land in controversy. Prior to April 22, 1889, Smith had indicated his intention to take the land in controversy by stating the fact to his fellow-workmen, but had done no act toward carrying out said intention. A notice was posted at the station of Edmond by A., T. & S. F. R. R. Co., warning all employés that if they expected to take land they must leave the Oklahoma country, and this fact was called to Smith's notice. Smith has since noon of April 22, 1889, continued to reside upon, cultivate and improve said land, in good faith, as a homestead, and now has improvements thereon. Smith is a legally qualified homesteader unless excluded by reason of his being in the Oklahoma country prior to April, 1889. Smith is at present in the employ of the A., T. & S. F. R. R. Co., and has been most of the time since April 22, 1889."

That on the trial of said contest the local land officers decided in plaintiff's favor; but on appeal to the Commissioner of the Land Office, he reversed their decision, which ruling of the Commissioner was subsequently affirmed by the Secretary of the Interior; and on February 28, 1891, plaintiff's homestead entry was cancelled; and that the defendant, on March 12, 1891, made a homestead entry of the land, which homestead entry was, on the 30th day of April, 1891, commuted, the land paid for at a dollar and a quarter per acre, and a final receipt issued therefor. Plaintiff claims that there was error of law in the ruling of the Commissioner of the Land Office and of the Secretary of the Interior, and prays that the defendant be decreed to hold the legal title to the land in trust for his use and benefit. To this bill of complaint a demurrer was filed, which, on May 16, 1891, was sustained by the District Court, and the complaint dismissed. From the decree of dismissal an appeal was taken to the Supreme Court of the Territory, which, on the first day of February, 1892,

affirmed the decision of the District Court. From that judgment of affirmance, the appellant has appealed to this court.

*Mr. A. H. Garland* and *Mr. H. J. May* for appellant.

*Mr. Assistant Attorney General Parker, Mr. John F. Stone, Mr. Charles A. Maxwell* and *Mr. George S. Chase* for appellee.

MR. JUSTICE BREWER delivered the opinion of the court.

This case turns on the construction to be given to the acts of March 1 and 2, 1889, and the proclamation of the President of March 23, 1889. The act of March 1, 1889, 25 Stat. 757, 759, c. 317, was an act ratifying and confirming an agreement with the Muscogee (or Creek) Indians in the Indian Territory, whereby a large body of their lands had been ceded to the United States. The second section of the act was in these words:

"That the lands acquired by the United States under said agreement shall be a part of the public domain, but they shall only be disposed of in accordance with the laws regulating homestead entries, and to the persons qualified to make such homestead entries, not exceeding one hundred and sixty acres to one qualified claimant. And the provisions of section twenty-three hundred and one of the Revised Statutes of the United States shall not apply to any lands acquired under said agreement. Any person who may enter upon any part of said lands in said agreement mentioned prior to the time that the same are opened to settlement by act of Congress shall not be permitted to occupy or to make entry of such lands or lay any claim thereto."

In the general Indian appropriation act, passed the next day, March 2, 1889, 25 Stat. 980, 1005, c. 412, was contained this provision applicable to these lands, as well as to lands acquired from the Seminoles:

"*And provided further,* That each entry shall be in square form as nearly as practicable and no person be permitted to enter more than one quarter section thereof, but until said

lands are opened for settlement by proclamation of the President, no person shall be permitted to enter upon and occupy the same, and no person violating this provision shall ever be permitted to enter any of said lands or acquire any right thereto."

And the proclamation of the President of March 23, 1889, contained this warning: " *Warning* is hereby again expressly given, that no person entering upon and occupying said lands before said hour of twelve o'clock, noon, of the twenty-second day of April, A. D. eighteen hundred and eighty-nine, hereinbefore fixed, will ever be permitted to enter any of said lands or acquire any rights thereto; and that the officers of the United States will be required to strictly enforce the provision of the act of Congress to the above effect." 26 Stat. 1546.

It is well settled that where the language of a statute is in any manner ambiguous, or the meaning doubtful, resort may be had to the surrounding circumstances, the history of the times, and the defect or mischief which the statute was intended to remedy. Thus, in *Heydon's Case*, 3 Rep. 7 *b*, it is stated that it was resolved by the Barons of the Exchequer as follows:

"For the sure and true interpretation of all statutes in general, be they penal or beneficial, restrictive or enlarging of the common law, four things are to be discerned and considered:

"First. What was the common law before the making of the act.

"Second. What was the mischief and defect for which the common law did not provide.

"Third. What remedy the Parliament hath resolved and appointed to cure the disease of the commonwealth.

"Fourth. The true reason of the remedy."

And by this court, in *United States* v. *Union Pacific Railroad*, 91 U. S. 72, 79, it was said that " courts, in construing a statute, may with propriety recur to the history of the times when it was passed; and this is frequently necessary, in order to ascertain the reason as well as the meaning of particular provisions in it. *Aldridge* v. *Williams*, 3 How. 24; *Preston*

v. *Browder,* 1 Wheat. 120." And in *Platt* v. *Union Pacific Railroad,* 99 U. S. 48, 64, that "in endeavoring to ascertain what the Congress of 1862 intended, we must, as far as possible, place ourselves in the light that Congress enjoyed, look at things as they appeared to it, and discover its purpose from the language used in connection with the attending circumstances." Pursuing an inquiry along this line, it will be seen that the Indian Territory lies between the State of Texas on the south and the State of Kansas on the north, and it is a matter of public history, of which we may take judicial notice, that as these two States began to be filled up with settlers, longing eyes were turned by many upon this body of land lying between them, occupied only by Indians, and though the Territory was reserved by statute for the occupation of the Indians, there was great difficulty in restraining settlers from entering and occupying it. Repeated proclamations were issued by successive Presidents, warning against such entry and occupation. Thus, on April 26, 1879, President Hayes issued a proclamation containing this warning:

" Now, therefore, for the purpose of properly protecting the interests of the Indian nations and tribes, as well as of the United States in said Indian Territory, and of duly enforcing the laws governing the same, I, Rutherford B. Hayes, President of the United States, do admonish and warn all such persons so intending or preparing to remove upon said lands or into said Territory, without permission of the proper agent of the Indian Department, against any attempt to so remove or settle upon any of the lands of said Territory; and I do further warn and notify any and all such persons who may so offend, that they will be speedily and immediately removed therefrom by the agent according to the laws made and provided; and if necessary, the aid and assistance of the military forces of the United States will be invoked to carry into proper execution the laws of the United States herein referred to." 21 Stat. 797.

A similar proclamation was issued on February 12, 1880, (21 Stat. 798,) another by President Arthur, on July 1, 1884, (23 Stat. 835,) and a fourth by President Cleveland, on March

13, 1885 (23 Stat. 843). This latter proclamation recited a fact, which is also a matter of public history, as follows: "And, whereas, it is further alleged that certain other persons or associations within the territory and jurisdiction of the United States have begun and set on foot preparations for an organized and forcible entry and settlement upon the aforesaid lands, and are now threatening such entry and occupation." And the urgency of the situation is disclosed by these closing words of the proclamation: "And if this admonition and warning be not sufficient to effect the purposes and intentions of the government as herein declared, the military power of the United States will be invoked to abate all such unauthorized possession, to prevent such threatened entry and occupation, and to remove all such intruders from the said Indian lands."

In addition to the fact disclosed by these proclamations, of the long-continued and persistent efforts to force an entry into this territory, it is well known that as the time drew near to the opening of it for occupation under and by virtue of the treaties with the Indian tribes, and in accordance with the laws of Congress, there was a large gathering of persons along the borders of this territory waiting the coming of the exact moment at which it would be lawful for them to move into it and establish homestead and other settlements. Under such circumstances as these, this legislation was passed, and what, in view thereof was the intent of Congress? As disclosed on the face of this legislation, evidently its purpose was to secure equality between all who desired to establish settlements in that territory. The language is general and comprehensive: "Any person who may enter upon any part of said lands . . . prior to the time that the same are opened to settlement . . . shall not be permitted to occupy or to make entry of such lands or lay any claim thereto." "Until said lands are opened for settlement by proclamation of the President, no person shall be permitted to enter upon and occupy the same, and no person violating this provision shall ever be permitted to enter any of said lands, or acquire any right thereto." No exception is made from the general language

of these provisions; and it was evidently the expectation of Congress that they would be enforced in the spirit of equality suggested by the generality of the language.

It is urged that there is a penal element in each of these sections, and that, therefore, the statute must be strictly construed. This penal element is found in those clauses which debar one violating the provisions of the sections from ever entering any of the lands, or acquiring any rights therein. But whatever of a penal element may be found in these parts of the sections, does not extend to those which are simply declaratory of the conditions upon which entry and occupation may be made. Provisions of like character are frequently found in statutes and constitutions. The general homestead law gives a right of homestead to persons possessing certain qualifications, but it is in no sense, therefore, a penal statute as to those not possessing such qualifications. The Constitution of the United States restricts the presidency to natural-born citizens, and such as are thirty-five years of age, and have been residents of the country for fourteen years, but there is nothing in this of a penal nature as against those not possessed of these qualifications. If Congress sees fit to impose a penalty on any individual who attempts to enter a homestead without possessing the statutory qualifications, the clause imposing the penalty may require a strict construction in a proceeding against the alleged wrongdoer, but that does not give to the residue of the statute, prescribing the qualifications, a penal character. That portion which describes the qualifications for entry is to be liberally construed, in order that no one be permitted to avail himself of the bounty of Congress, unless evidently of the classes Congress intended should enjoy that bounty. This idea is expressed in 1 Bl. Com. 88, in these words:

"Statutes against frauds are to be liberally and beneficially expounded. This may seem a contradiction to the last rule, most statutes against frauds being in their consequences penal. But this difference is here to be taken: where the statute acts upon the offender, and inflicts a penalty, as the pillory or a fine, it is then to be taken strictly; but when the statute acts

upon the offence, by setting aside the fraudulent transaction, here it is to be construed liberally."

Construing the statute in the light of these observations, it will be noticed, first, that the provisions apply to the land collectively. The prohibition is against entering upon "any part of said lands," meaning thereby the whole body of lands, and in this body was included the right of way of the railroad company. The company had simply an easement, not a fee in the land. Its rights sprang from the act of Congress of July 4, 1884, 23 Stat. 73, c. 179, granting the right of way to the Southern Kansas Railway Company, whose successor in interest was the Atchison, Topeka and Santa Fé Railroad Company. This act, by section 2, granted a right of way, and also provided that the land taken therefor should be used only for the construction and operation of railroad, telegraph and telephone lines; and that whenever any portion thereof ceased to be so used, it should revert to the nation or tribe of Indians from which it was taken. The act further provided, section 7, that the officers and employés might reside on the right of way, but subject to the provisions of the Indian intercourse laws, and such rules and regulations as might be established by the Secretary of the Interior in accordance therewith. And, by section 10, the grant was made conditioned that neither the company, nor its successors or assigns, should aid, advise or assist in any effort looking towards the change of the present tenure of the Indians in their lands, or attempt to secure from the Indian nations any further grant of lands or its occupancy. In other words, the entire body of lands still remained Indian lands.—the fee continued in the Indians, and all that the company received was a mere right of way. So, when the treaty of cession was made between the Creek Nation of Indians and the government, it was a cession of all lands lying west of a certain line, with no exceptions, and it was this body of lands which was declared by the act of March 1, 1889, to be a part of the public domain, and thereafter subject to homestead entries; and the proclamation of the President, naming the exact hour at which the lands should

be open to settlement, describes a body of land by metes and bounds, and makes no exception of the railroad right of way, though it does of two acres, specially described and reserved for governmental use and control. Doubtless whoever obtained title from the government to any quarter section of land through which ran this right of way would acquire a fee to the whole tract subject to the easement of the company; and if ever the use of that right of way was abandoned by the railroad company the easement would cease, and the full title to that right of way would vest in the patentee of the land. But whether this be so or not, it is enough that in the cession, in the acts of Congress, and in the proclamation of the President the land was dealt with as an entirety, with certain metes and bounds, and it is that body of lands, thus bounded, which all parties were forbidden to enter upon who desired thereafter to enter any portion as a homestead.

Counsel contend that the words "enter" and "entry" have a technical meaning in the land laws; that the disqualification in the act of March 1, from entering upon any part of said lands, was modified by the act of March 2, so as to make it consist in entry and occupation, both being essential; and, quoting from the brief, "this was done to relieve the thousands of persons, or 'boomers,' as they were called, from the disability they may have incurred by an entry alone; but to keep them from selecting and occupying — that is, living on any tract of land prior to the time when the land should be opened to settlement and entry under the proclamation which the act of March 2 authorized the President to issue — the clause was inserted that 'any person entering upon and occupying the same' should be disqualified."

Their idea seems to be, that parties might go wheresoever they pleased through this body of lands, without subjecting themselves to the disqualification of the statute, providing only that before the date fixed for the opening of the lands for settlement they did not commence an actual living upon the particular tracts they desired to enter as homesteads. Under such a construction anybody might go into the Territory — every quarter section might be occupied by a resident

— and all that would be necessary to prevent the operation of the statute would be that on noon of April 22 adjoining neighbors changed their residences. Thus it would be that each party entering upon and occupying any particular tract, entered upon and occupied it for the first time after noon of April 22, and so was entitled to perfect his homestead entry. But this is simply to emasculate the statute. It treats the act of March 1 as repealed by that of March 2, and repeals by implication are not favored. It would destroy absolutely that equality which was evidently the intent of Congress in the legislation. Two parties might rightfully, immediately after the acts of Congress and the proclamation of the President, enter upon and occupy two adjoining tracts, and then change at the moment fixed, and thus create as to those respective tracts thus changed a prior occupation, as against all parties not reaching the Territory until April 22. " Enter " and " entry " may be technical words in the statute, but the expressions " enter upon" and " enter upon and occupy " are used in the ordinary sense of the words, and have no technical significance in this statute. The evident intent of Congress was, by this legislation, to put a wall around this entire Territory, and disqualify from the right to acquire, under the homestead laws, any tract within its limits, every one who was not outside of that wall on April 22. When the hour came the wall was thrown down, and it was a race between all outside for the various tracts they might desire to take to themselves as homesteads.

But it is said that the appellant was rightfully on the railroad company's right of way ; that he had the express sanction of Congress to be there; and that when the hour of noon of April 22 arrived he had, as an American citizen, possessing the qualifications named in the homestead laws, the right to enter upon any tract within the Territory for the purpose of making it his homestead. While he may have had all the qualifications prescribed by the general homestead law, he did not have the qualifications prescribed by this statute ; and there is nothing to prevent Congress, when it opens a particular tract for occupation, from placing additional qualifications

on those who shall be permitted to take any portion thereof. That is what Congress did in this case. It must be presumed to have known the fact that on this right of way were many persons properly and legally there; it must also have known that many other persons were rightfully in the Territory — Indian agents, deputy marshals, mail carriers and many others; and if it intended that these parties, thus rightfully within the Territory on the day named, should have special advantage in the entry of tracts they desired for occupancy, it would have been very easy to have said so. The general language used in these sections indicates that it was the intent to make the disqualifications universally absolute. It does not say "any person who may wrongfully enter," etc., but "any person who may enter" — "rightfully or wrongfully" is implied. There are special reasons why it must be believed that Congress intended no relaxation of these disqualifications on the part of those on the company's right of way, for it is obvious that, when a railroad runs through unoccupied territory like Oklahoma, which on a given day is opened for settlement, numbers of settlers will immediately pour into it, and large cities will shortly grow up along the line of the road; and it cannot be believed that Congress intended that they who were on this right of way in the employ of the railroad company should have a special advantage of selecting tracts, just outside that right of way, and which would doubtless soon become the sites of towns and cities.

It may be said that if this literal and comprehensive meaning is given to these words, it would follow that any one who, after March 2 and before April 22, should chance to step within the limits of the Territory, would be forever disqualified from taking a homestead therein. Doubtless he would be within the letter of the statute; but if at the hour of noon on April 22, when the legal barrier was by the President destroyed, he was in fact outside of the limits of the Territory, it may perhaps be said that if within the letter he was not within the spirit of the law, and, therefore, not disqualified from taking a homestead. Be that as it may, — and it will be time enough to consider that question when it is

presented, — it is enough now to hold that one who was within the territorial limits at the hour of noon of April 22 was, within both the letter and the spirit of the statute, disqualified to take a homestead therein.

The judgment of the Supreme Court of the Territory was right, and it is

*Affirmed.*