# FLEMING v. HAWKEYE PEARL BUTTON CO. et al.

### No. 11592.

Circuit Court of Appeals, Eighth Circuit.
June 26, 1940.

Alex Elson, of Chicago, Ill., and Rufus G. Poole, Associate General Counsel, of Washington, D. C. (George A. McNulty, General Counsel, Irving J. Levy, Asst. General Counsel, and Kenneth C. Robertson, all of Washington, D. C., Lee K. Beznor, of Chicago, Ill., Carl A. Auerbach, of Washington, D. C., and Robert J. Wieferich, of Chicago, Ill., on the brief), for appellant.

Wayne G. Cook, of Davenport, Iowa (G. Allbee and Harold E. Wilson, both of Muscatine, Iowa, William T. Waterman, of Davenport, Iowa, Allbee & Allbee, of Muscatine, Iowa, and Lane & Waterman, of Davenport, Iowa, on the brief), for appellees.

Before GARDNER and SANBORN, Circuit Judges, and COLLET, District Judge.

GARDNER, Circuit Judge.

This is an appeal from an order of the lower court granting appellees' motions to dismiss appellant's action brought to enjoin alleged violations of the Fair Labor Standards Act of 1938. Act of June 25, 1938, c. 676, 52 Stat. 1060–1069, 29 U.S.C. §§ 201–219, 29 U.S.C.A. §§ 201–219.

The action was commenced by the Administrator of the Wage and Hour Divi-

sion of the United States Department of Labor. Defendants were the Hawkeye Pearl Button Company and numerous individuals. Some of the individual defendants entered their appearance and consented to the entry of judgment against them. The other defendants, the appellees here, filed motions to dismiss the complaint on the ground that it failed to state a cause of action against the appealing defendants upon which relief might be granted. As the motions were sustained, we must accept as true all the well pleaded facts as set forth in the complaint. So far as relevant to the issues, they are substantially as follows:

The Hawkeye Pearl Button Company is an Iowa corporation, with its principal place of business at Muscatine, Iowa. It is engaged in the manufacture, sale and distribution of buttons and pearl novelties, such as watch fobs and necklaces made from clam shells and composition buttons made from casein and other materials. In connection with this business it operates a number of button cutting plants located at Muscatine, Iowa, Keokuk, Iowa, and Canton, Missouri. It maintains a sales office at New York City. These shells are obtained from fresh water clams, which are inedible. Shortly after October 24, 1938, it began a reduction of operations in its cutting plants and encouraged and promoted an increase in the number of small cutting plants commonly referred to in the trade as "privy plants," and an increase in the operations of such plants, including those of the individual defendants, who are dominated and controlled by the Hawkeye Pearl Button Company. The individual defendants are "cutters," that is, they engage in but one aspect of the process of making buttons, the cutting of round pieces of shells from fresh water clam shells. The portions so cut are referred to in the trade as "button blanks." It is from the button blanks that the buttons are made. The cutters are supplied with these fresh water clam shells by the Hawkeye Company. Such shells are obtained from river beds in the states in the Mississippi River Valley, the Ohio River Valley and the Tennessee River Valley and in other states, and are purchased by the Hawkeye Pearl Button Company and brought into Iowa and distributed to the cutters. In addition to use in the manufacture of buttons, clam shells are used for the manufacture of shell novelties, for road materials, for poultry feed, and in other

ways. Within its own plant, the Hawkeye Company employs persons not only in the cutting of button blanks, but in all the steps necessary to the manufacture of buttons from clam shells. It operates a large button finishing factory for the purpose of finishing and sorting button blanks produced in its button cutting shops. 185 employees, exclusive of office staff and executives, are employed in this finishing factory.

The various steps in the manufacture of buttons are described in the complaint in some detail. In general, these steps include: (1) the classification of the shells into different sizes; (2) placing them in soaking tanks before they are cut into blanks; (3) cutting the blanks with machinery; (4) classifying the blanks according to their various thicknesses and quality; (5) churning and grinding them so as to remove rough edges; (6) soaking them for the purpose of softening them so that they may be machined; (7) putting them through machines for the purpose of shaping and drilling them; (8) again putting them through a churning process for the purpose of polishing; and (9) finally sorting, grading and packing them.

None of the employees of the company, while employed in its plants, engaged in catching, taking, gathering, cultivating or harvesting of clams or clam shells from rivers or other bodies of water, nor in the operation or processing of clams or clam shells for distribution or sale as such, nor in the distribution or sale thereof to other manufacturers of buttons, and no violation of the Act is claimed as to any of its employees who may be engaged in any such activities, nor as to employees of cutters who may be engaged in any such activities. There are allegations adequate to show the required relationship to and connection with interstate commerce. Violations of the Fair Labor Standards Act of 1938 are charged in that a wage of less than 25¢ per hour was paid employees. Sections 6 and 7 of the Act read as follows:

*"Minimum Wages*

"Sec. 6 [§ 206]. (a) Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at the following rates—

"(1) during the first year from the effective date of this section, not less than 25 cents an hour,

"(2) during the next six years from such date, not less than 30 cents an hour,

"(3) after the expiration of seven years from such date, not less than 40 cents an hour, or the rate (not less than 30 cents an hour) prescribed in the applicable order of the Administrator issued under section 8 [208], whichever is lower, and

"(4) at any time after the effective date of this section, not less than the rate (not in excess of 40 cents an hour) prescribed in the applicable order of the Administrator issued under section 8 [208].

"(b) This section shall take effect upon the expiration of one hundred and twenty days from the date of enactment of this Act [chapter].

"*Maximum Hours*

"Sec. 7 [§ 207]. (a) No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce—

"(1) for a workweek longer than forty-four hours during the first year from the effective date of this section,

"(2) for a workweek longer than forty-two hours during the second year from such date, or

"(3) for a workweek longer than forty hours after the expiration of the second year from such date,

unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

The motions to dismiss are based upon the contention that the employees of the Hawkeye Company and the other appellees are exempt from the wage and hour provisions of the Act (Secs. 6 & 7) by reason of the exemption contained in Section 13(a) (5). Section 13(a) (5) provides that Sections 6 and 7 shall not apply to " * * * any employee employed in the catching, taking, harvesting, cultivating, or farming of any kind of fish, shellfish, crustacea, sponges, seaweeds, or other aquatic forms of animal and vegetable life, including the going to and returning from work and including employment in the loading, unloading, or packing of such products for shipment or in propagating, processing, marketing, freezing, canning, curing, storing, or distributing the above products or by-products thereof".

The sole question for determination on this appeal is, therefore, whether or not employees engaged in the manufacture of buttons from clam shells are exempt from the wage and hour provisions of the above quoted Act by virtue of the exemptions contained in Section 13(a) (5). The meaning of the statute must in the first instance at least be sought in its language, and if that is plain and the Act is constitutional, the sole function of the court is to enforce it. Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A. 1917F 502, Ann.Cas.1917B, 1168. If the statutory meaning is clear, there is, of course, no occasion to resort to rules of construction. Andrews v. St. Louis Joint Stock Land Bank, 8 Cir., 107 F.2d 462. In Thompson v. Terminal Shares, Inc., 8 Cir., 104 F.2d 1, 8, we said: "'A thing which is within the intention of the makers of a statute is as much within the statute as if it were within the letter; and a thing which is within the letter of the statute, is not within the statute, unless it be within the intention of the makers.' People v. Utica Ins. Co., 15 Johns., N.Y., 358, 381, 8 Am.Dec. 243; Territory of Hawaii v. Mankichi, 190 U.S. 197, 212, 23 S.Ct. 787, 47 L.Ed. 1016; Barrett v. Van Pelt, 268 U.S. 85, 90, 91, 45 S.Ct. 437, 69 L.Ed. 857."

In Heydenfeldt v. Daney Gold Min. Co., 93 U.S. 634, 638, 23 L.Ed. 995, it is said: "If a literal interpretation of any part of it [a statute] would operate unjustly, or lead to absurd results and be contrary to the evident meaning of the Act taken as a whole, it will be rejected; and there is no better way of discovering the true meaning of a law when there are expressions in it which are rendered ambiguous by their connection with other clauses, than by considering the necessity for it, and the causes which induced the Legislature to pass it." Compare: Keifer & Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784.

In the last cited case, the power to sue and be sued was held to be granted to a corporate agency of the Federal Government, as a result of generally expressed congressional intentions, despite the absence of any expressed statement of such power in the act of creation. In Inland Waterways Corp. v. Young, 60 S.Ct. 646, 649, 84 L.Ed. 901, opinion filed March 25, 1940, it was held that a national bank might pledge assets to secure deposits of

funds made by governmental agencies although "not 'public moneys" within the scope of Section 45 of the National Banking Act, 13 Stat. 99, 113, 12' U.S.C. § 90, 12 U.S.C.A. § 90. In that case, Mr. Justice Frankfurter said that "the history and purposes of the statute and the traditional policy of the National Government in utilizing the national banks as fiscal agencies must give meaning to the silence of the Act." Hence, Section 45 was said to be not a departure from public policy, viewed through the experience of the prior decades of national financial history, but "a manifestation of historic national practice, which is to be given scope consonant with the reason for its development."

In Section 2 of the Act, the findings of Congress are stated, to the effect that there exists in industries engaged in interstate commerce labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general .well-being of workers, which have caused an unwholesome state of affairs in interstate commerce, resulting in such conditions being perpetuated among the workers of the several states and burdening commerce and the free flow of goods in commerce, and resulting also in unfair methods of commerce, labor disputes, and interference with the orderly and fair marketing of goods in interstate commerce. The preamble may properly be referred to to assist in ascertaining the intent and meaning of a statute susceptible of different constructions. Price v. Forrest, 173 U.S. 410, 19 S.Ct. 434, 43 L.Ed. 749. The manifest declared purpose of the statute was to eradicate from interstate commerce the evils attendant upon low wages and long hours of service and industry. Accepting this as the declared purpose of the Act, exemptions would tend to defeat its purpose. The statute is remedial, with a humanitarian end in view. It is therefore entitled to a liberal construction. Grier v. Kennan, 8 Cir., 64 F.2d 605.

We must assume that all employees in interstate commerce, so far as reasonably possible, should be made subject to the provisions of the Act. This is emphasized by the title (United States v. Katz, 271 U.S. 354, 46 S.Ct. 513, 70 L.Ed. 986), the findings and declaration of policy contained in Section 2, the inclusiveness of the language of Section 6 ("Every employer"), and of Section 8(a), reciting that "the objective of a universal minimum wage of 40 cents an hour in each industry engaged in commerce or in the production of goods for commerce," etc.

Section 13(a) (5) creates an exception to the general scope of the Act, and hence is subject to strict construction. Thompson v. United States, 8 Cir., 258 F. 196; United States v. Maryland Casualty Co., 7 Cir., 49 F.2d 556; United States v. Dickson, 15 Pet. 141, 165, 10 L.Ed. 689. In the last cited case it is said: "In short, a proviso carves special exceptions only out of the enacting clause; and those who set up any such exception, must establish it as being within the words as well as within the reason thereof."

This rule of construction is applicable even though the statute contains certain penal provisions. Here no penalties are sought to be enforced but remedies. In such circumstances, exemptions should be construed strictly. Smith v. Townsend, 148 U.S. 490, 13 S.Ct. 634, 37 L.Ed. 533.

We are of the view that the manifest purpose of the exemption was to except from the Act such activities or operations connected with the maritime pursuits described, as were controlled or materially influenced by natural factors or elements. The exemption applies first to what are known in the fishing industry as trip operations, these being described in the Act as "catching, taking, harvesting, cultivating, or farming of any kind of fish, shellfish, crustacea, sponges, seaweeds, or other aquatic forms of animal and vegetable life, including the going to and returning from work." The second exemption is described in the industry as shore operations, and these are enumerated as "employment in the loading, unloading, or packing of such products for shipment or in propagating, processing, marketing, freezing, canning, curing, storing, or distributing the above products or byproducts thereof." This language follows the description of trip operations, including the going to and returning from work "and including employment in the loading, unloading, or packing of such products for shipment," etc. The use of the word "including" is significant. It brings in, assimilates and connects the described shore operations with the trip operations. The shore operations are exempted when, and only when, they relate to trip operations. Trip operations are controlled and determined to a large extent by vari-

able and unpredictable natural factors sucn as fog, tide, current, storm, high or low water, the run of the fish, and other similar factors or elements and forces not within human control. Such operations can not be assigned to definite periods or services, nor can services be limited to specific hours. There is the element of uncertainty in the catch, and the danger and hazard not associated with the operations of the ordinary factory or commercial establishment. Shore operations which are connected with the preservation and conversion of the catch must occur immediately following the catch or the catch will spoil, and such operations have a necessary and logical connection with the trip operations and hence their inclusion in the statutory exemptions. We do not think it was the intent of Congress to go further and exempt a process so far removed as the making of buttons from the shells of the fresh water clam. Shells are stored for use and may not be manufactured into buttons until years later. In the making of pearl buttons from these shells, the shells are shipped to the factories after they have been boiled and the non-edible interior removed. The factor of perishability does not therefore enter into the question of converting the shells into buttons.

 It is contended by appellees that the term "processing" is ambiguous and is susceptible of several different meanings. We are not here interested in the meaning of the word in the abstract. Its meaning must be controlled by the context and the legislative intent. United States v. Salen, 235 U.S. 237, 35 S.Ct. 51, 59 L.Ed. 210. The context consistent with the legislative intent limits the meaning of the word "processing" to those activities which have to do with the preservative treatment of aquatic products, and the preparation for market of perishable products of the trip operations. Manifestly, Congress would not have exempted the shore operations alone. There is a relationship between them and the trip operations which is proximate, rational and apparent. The words "propagating, * * * marketing, freezing, canning, curing, storing, or distributing" products or by-products indicate the relationship existing between immediate operations on shore which are necessary to make the catch or take marketable. "Processing," as used in this exemption provision of the statute, must,

we think, have been used to describe such operations and not manufacturing operations having no immediate or necessary relationship in time to the catch or take. The interpretation given to the term "processing" by the trade affected by the exemption is significant. In Carter v. Liquid Carbonic Pacific Corporation, 9 Cir., 97 F.2d 1, 3, the court, in considering the question as to whether a particular product was a "carbonated beverage" or a "soft drink" within the meaning of the Revenue Act of 1932, § 615(a) (7), 26 U.S.C.A. Int.Rev.Acts, p. 613, said: "Since we are dealing with a tax which is directed at a particular industry, this definite proof of a trade usage as to the term 'carbonated beverages' calls into application the familiar rule that commercial and trade terms having a uniform and definite meaning in commerce and trade will be interpreted accordingly."

 In ascertaining the meaning of a term, we may resort to any authoritative source of information. The files and records of the United States Department of Commerce record that at a meeting of the employers in the fishing industry in the United States, pursuant to provisions of Section 3(a) of the National Industrial Recovery Act, 48 Stat. 196, the following interpretation of the term "processing" was approved: "The term 'processing' means the packing in ice of, filleting of, cutting of, freezing of, salting of, smoking of, drying of, canning of, extracting oil from, manufacturing meal or fertilizer from, products of the industry; or otherwise manipulating products of the industry; Provided, however, that the term 'processing' shall not include the refining of oils from products of the industry; the manufacture of mixed foods or mixed fertilizer from products of the industry; or the manufacture of products obtained from shells, fish scales, sponges, sounds, skins, hides, bones, aquatic plants, ambergris, cuttlefish bone, and whalebone."

This was the definition of the term "processing" adopted for purposes of the Code of Fair Competition for the fishing industry. It will be observed that it did not include the manufacture of buttons from shells.

 It is argued that this was a sick industry, and that it was the intent of Congress not to injure ailing industries, but any such declared intent can not be con-

strued as indicating a general policy of exemption because a particular industry may not be financially prosperous. The minimum wage provisions of Section 6 are absolute, except for the exemptions of Section 13. True, the Administrator may make wage orders under the provisions of Section 8, and provision is made that such orders shall not substantially curtail employment. Section 8 (a) (b) (c) (e). The declaration of policy clearly refers to such orders which may be made effective as exceptions to the general policy of Section 6 only if they do not have the effect of substantially curtailing employment. It would be unreasonable to say that Congress intended to exempt as a sick industry the fresh water pearl button industry. Congressional concern in sick industries was not manifested by a desire to give them exemptions but by fixing the minimum wage scale at the low figure of 25¢ per hour at the commencement, progressively increasing the wage scale to 40¢ per hour after seven years from the effective date of the Act. Section 6. If, in the competitive struggle, any business or industry could not survive and pay such wages, its existence could not be prolonged at the expense and to the prejudice of employees.

It is argued that Congress exempted agriculture in Section 13 because it was a sick industry, and hence, it must have intended to exempt the pearl button making industry for the same reason. But, as we have pointed out, the motivating purpose of Congress was to benefit industrial workers. Both federal and state governments have recognized a marked difference between industrial workers and agricultural laborers. Agriculture was manifestly exempted from the provisions of the Act because it was not considered feasible to regulate wages paid agricultural laborers. Different considerations apply in the case of agricultural labor than in the case of industrial labor. Agricultural labor is not subject to the evils of sweating which may be present in the factory system. There is no evil of mass employment at low wages in agriculture, nor are the same problems of working long hours indoors, nor of health and sanitation present. Any attempt to regulate farm wages would seem to present a difficult question because the farm laborer generally does and must of necessity receive a substantial part of his income in board, room and laundry. Experience and necessity preclude treatment of farm labor in a statute framed to remove from the national economic life the evils of industrial labor. The exemption of agricultural labor from the operation of the Act can not be cited as an argument justifying a construction which would exempt labor in an industry from its operation.

While we do not think it necessary to refer to the legislative history of the Act, we think it worthy of note that an amendment providing for the exemption of employees engaged in the "manufacture of fishery products" was rejected. The refusal of Congress to thus broaden the Act to include the manufacture of fishery products clearly shows its intention to omit the manufacture of such products. This is a circumstance which should be weighed with others. Carey v. Donohue, 240 U.S. 430, 36 S.Ct. 386, 60 L.Ed. 726, L.R.A. 1917A, 295; Fox v. Standard Oil Co., 294 U.S. 87, 55 S.Ct. 333, 79 L.Ed. 780.

To construe the exemption statute as including employees engaged in making buttons from clam shells while excluding employees engaged in making buttons from other material, results in an absurdity. In the button factory of the Hawkeye Company materials other than clam shells are used in manufacturing buttons. Appellees' contention would exempt the employees who chanced to be making buttons from clam shells, but would not exempt the employees similarly situated who might be making buttons from casein and other materials. Such discrimination would result in an injustice. Many raw materials are used in the manufacture of buttons. An exemption in one branch of the industry from the minimum wage standards would disturb competitive factors.

We conclude that the order appealed from should be and is reversed and the cause is remanded to the lower court for further proceedings consistent herewith.