W. Willard WIRTZ, Secretary of Labor, United States Department of Labor (Sub Nom. Arthur J. Goldberg, Secretary of Labor, United States Department of Labor), Plaintiff,

v.

CHESAPEAKE BAY FROSTED FOODS CORPORATION, a corporation, Defendant.

Civ. A. No. 751.

United States District Court
E. D. Virginia,
at Newport News.

July 26, 1963.

Roger T. Williams, Asst. U. S. Atty., Norfolk, Va., and Jeter S. Ray, Nashville, Tenn., for plaintiff.

Dunton, McLeod & Simmons, White Stone, Va., for defendant.

MICHIE, District Judge.

This action was brought on December 19, 1960 by the Secretary of Labor under the authority of 29 U.S.C.A. § 217 to enjoin the defendant from continuing alleged violations of the Fair Labor Standards Act (29 U.S.C.A. §§ 201–219). The defendant contends that it is within the so called "seafood exemption" of the Act and that it therefore has not violated the Act in any way. The controversy is essentially one of law since virtually all of the material facts have been stipulated by both parties.

Because relevant portions of the Fair Labor Standards Act were substantially amended in 1961 and because the consistency of the statutory exemption up to that time is a material element in this controversy, it is necessary to examine briefly the statutory development of the "seafood exemption" before attempting to discuss the facts of the present case. The Fair Labor Standards Act was passed in 1938. At that time the "seafood exemption" was created by § 213(a) (5) and read as follows:

"(a) The provisions of sections 206 [minimum wage requirements] and 207 [overtime pay requirements] shall not apply with respect to—(5) any employee employed in the catching, taking, harvesting, cultivating, or farming of any kind of fish, shellfish, crustacea, sponges, seaweeds, or other aquatic forms of animal and vegetable life, including the going to and returning from work and including employment in the loading, unloading, or packing of such products for shipment or in propagating, processing (other than canning), marketing, freezing, curing, storing, or distributing the above products or by products thereof." (bracketed material added)

In 1949 the exemption was amended by removing the word "canning" from it and inserting the parenthesized phrase "(other than canning)" after the word "processing." At that time § 213(b) (4) was passed which exempted "any employee employed in the canning of any kind of fish, shellfish, or other aquatic forms of animal or vegetable life, or any by-product thereof" from the overtime

pay requirements of § 207. Then in 1961 the exemption was radically revised. § 213(a) (5) was rewritten so that its scope was narrowed considerably:

"(a) The provisions of sections 206 and 207 of this title shall not apply with respect to—

\*    \*    \*    \*    \*    \*

"(5) any employee employed in the catching, taking, propagating, harvesting, cultivating, or farming of any kind of fish, shellfish, crustacea, sponges, seaweeds, or other aquatic forms of animal and vegetable life, or in the *first* processing, canning or packing such marine products *at sea* as an incident to, or in conjunction with, such fishing operations, including the going to and returning from work and loading and unloading when performed by any such employee; \*  \*  \*." (emphasis added)

And § 213(b) (4) was rewritten in such a way as virtually to incorporate the second half of the old § 213(a) (5) into its provisions:

"(b) The provisions of section 207 of this title shall not apply with respect to—

\*    \*    \*    \*    \*    \*

"(4) any employee employed in the canning, processing, marketing, freezing, curing, storing, packing for shipment, or distributing of any kind of fish, shellfish, or other aquatic forms of animal or vegetable life, or any byproduct thereof; \*  \*  \*."

The defendant is an on shore producer of various breaded seafood products, whose activities we will discuss in detail shortly. Its counsel argue that until the 1961 amendment the defendant was squarely within § 213(a) (5) of the Act, being thus exempted from the § 206 and § 207 requirements of the Act, and that after 1961 its operations fall within § 213(b) (4) of the Act, thus exempting it from the § 207 requirements of the Act. It admits that after the 1961 amendment its activities no longer fall within the § 213(a) (5) exemption. However, because of a provision contained in the present version of § 206 which gives special treatment to employers "brought within the purview of this section by the amendments made to section 213(a) of this title by the Fair Labor Standards Amendments of 1961 \* \*" (29 U.S.C.A. § 206(b)), the question of whether the defendant was exempted under the pre-1961 version of § 213(a) (5) is not moot and must be decided by this Court.

The defendant, of course, admits that it did not meet the § 206 or § 207 requirements of the Act insofar as its wage scale and overtime wage scale are concerned before the 1961 amendments and has met the § 206 requirement after 1961 only if it was first made subject to that requirement by the 1961 amendments.

The central issue in this controversy is the contested validity of an interpretation of the "seafood exemption," made public by the Labor Department, apparently for the first time, in 1959, which states that employees engaged in the type of work that is normally exempted do not fall within the statutory exemption if the finished product involved contains a substantial amount of non-aquatic matter and that for enforcement purposes 20% non-aquatic matter is to be considered a substantial amount.[1]

The defendant is engaged in an industry which, according to the evidence offered in this case, only got started on a

---

1. Relevant portions of the present official interpretation can be found in Title 29 C.F.R. Part 784. They read in part as follows:
"Section 784.110 Performing operations both on nonaquatic products and named aquatic products.

"By their terms, section 13(a) (5) and 13(b) (4) provide no exemption with respect to operations performed on any products other than the aquatic products named in these subsections (see section 784.107). Accordingly, neither of the exemptions is applicable to the making of

commercial basis in the early and middle 1950's. It produces a variety of frozen breaded seafood commodities which are prepared in such a way that they may be taken out of their containers and, while still in a frozen state, dropped into a skillet for frying. The convenience of this arrangement, its delicious culinary results and the large increase in home-owned deep freeze units in the last 15 years has made the breaded seafood industry blossom from virtual non-existence in 1950 to constitute a significant segment of the total seafood production in the United States at the present time. Since all the evidence in this case indicates that it is impossible to turn out a good breaded seafood product without using more than 20% non-aquatic material,[2] the question of the validity of the Labor Department's 20% interpretative ruling is of the utmost importance, not only to this defendant, but to a number of other seafood processors throughout the country.

Specifically, this defendant processes and freezes for marketing in interstate commerce breaded oysters, breaded shrimp, breaded scallops, breaded fish sticks, breaded seafood dinners,[3] crab cakes, and deviled crabs.[4] Since we are vitally concerned with exactly what the statutory exemption means by the words "processing, marketing, freezing * * * any kind of fish, shellfish, crustacea, sponges, seaweeds, or other aquatic forms of animal and vegetable life," it is necessary to examine in detail exactly what the defendant does in its processing of these various products.

1) *Breaded oysters*—The raw oysters are bought by the defendant from various oystering concerns who operate principally in the Chesapeake Bay area of Virginia. When delivered to the defendant, the oysters have been shucked, cleaned and placed in large containers in bulk form. Mr. Saunders, defendant's owner, emphasized in his testimony the perishable quality of oysters, which not only leads to complete spoilage in a very short time (two weeks at most) but also causes great deterioration in the oysters' flavor within a few days. He further testified that because of the seasonal nature of oystering his company is forced to contract with the various oystering concerns to take a rather large amount of oysters per day during the season when oysters are plentiful. Since the oysters cannot be frozen before the defendant breads and packages them, this means that during the oyster season the defendant, like the men who actually tong or dredge the oysters, is forced to work long hours in order to compete successfully in his business. Mr. Saunders further testified that breaded oysters make up about ⅓ of his company's total production and that more than twice as many breaded

any commodities from ingredients only part of which consist of such aquatic products, *if a substantial amount of other products is contained in the commodity so produced*. . . . (Emphasis added)
"Section 784.112 Substantial amounts of nonaquatic products; enforcement policy.
"As an enforcement policy in applying the principles stated in sections 784.110 and 784.111, *if more than 20 percent* of a commodity consists of products other than aquatic products named in section 13(a) (5) or 13(b) (4), the commodity will be deemed to contain a substantial amount of such nonaquatic products." (Emphasis added)
It should be noted that although the interpretative bulletin is not clear on the point, the tests used in the evidence taken in this case treated the 20% figure as meaning 20% *by weight*.

2. One of defendant's expert witnesses testified that a breaded seafood product which contained less than 20% breading would, after cooking, be dry, tough, lacking in flavor and unattractive to the eye.

3. These seafood dinners are not dinners complete with vegetables but merely contain a mixture of breaded shrimp, breaded scallops, breaded fish sticks, and crab cakes—all in the same package.

4. The defendant also turns out other seafood products, such as quick frozen trout, to which no breading is added. These products make up a very minor part of its total production, and both parties concede that they have no effect on the controversy.

oysters are produced by the defendant as any other of its products.

After receiving the shucked and cleaned oysters, the defendant's employees grade them for size, drain and spray them. The oysters are then placed in a machine which passes the oysters through a batter compound composed of a mixture of corn and wheat flour, soya flour, salt, eggs, non-fat dry milk, monosodium glutamate, seasonings and water. The oysters are then rolled into a breading compound which is composed of wheat and corn flour, non-fat dry milk solids, salt, dry egg solids, monosodium glutamate, seasonings and spices. The battering and breading activity is repeated, after which the oysters are placed either in institutional or retail packages and then frozen.[5]

It is conceded by both sides that the breaded oysters contain more than 20% non-aquatic matter, but witnesses for both sides testified that there is no known method of accurately determining the exact percentage of breading in breaded oysters because of the peculiar qualities of the oysters' flesh.

2) *Breaded shrimp, breaded scallops and breaded fish sticks*—The treatment of each of these products differs slightly from each of the others and from that of breaded oysters but the differences would appear to be immaterial as far as the application of the Fair Labor Standards Act is concerned so there would appear no need here to describe such treatment in the detail in which the treatment of breaded oysters has just been described. The ultimate breaded shrimp product contains approximately 40% of non-aquatic material, the breaded scallops 30% to 40% and the breaded fish sticks 30% to 45% and these products make up, respectively, about 16%, 10% to 15% and 10% of the defendant's products. Regarding their perishability, it appears from the testimony that, al-

though it is commercially possible to freeze the raw materials in all three of these products for storage before they are processed, this is only done exclusively in the case of fish sticks. Except in an emergency, all of defendant's scallops, which, like oysters, are subject to seasonal fluctuations in supply, are purchased and processed without being frozen beforehand and approximately one-half of defendant's shrimp are processed while still fresh from the sea. Unless frozen for storage, all of these products are of course highly perishable.

3) *Crab cakes and deviled crabs*—Crab meat is purchased from seafood concerns principally in Virginia in bulk form, prior to the receipt of which the crabs have been steamed, cleaned, cracked and picked of their meat. Crab shells for the deviled crabs are purchased from local commercial crab houses, prior to the receipt of which the crab has been cooked and the body of the shellfish has been removed. The crab meat, like oysters, cannot be frozen for storage prior to the breading operation and it is highly perishable. Furthermore the supply fluctuates with the seasons. Upon receipt at defendant's plant the crab meat must be repicked by defendant's employees to remove small fragments of skeleton and shell prior to its use in preparing crab cakes and deviled crabs. After this repicking it is measured for quantity and is mixed with spices, bread crumbs and a cream sauce which is composed of flour, worcestershire sauce, mustard, pepper, salt, lemon juice, parsley, onions, hot sauce and monosodium glutamate for producing crab cakes. This mixture is shaped by machinery and by hand and battered and breaded by the same process as above mentioned for breaded oysters. Following these steps, the crab cakes are then placed in a deep fat fryer in hot vegetable oil and "browned off" for thirty seconds, cooled, packed and frozen.

---

5. This paragraph describes the breading process which is used on all the defendant's products involved in this case except deviled crabs, and when variations on the verb "to bread" are used throughout this opinion, they allude to this process.

Deviled crabs are prepared by mixing picked crab meat with spices, bread crumbs and cream sauce which is composed of the same ingredients as above mentioned in the preparation of crab cakes. The resulting mix is then placed in hand cleaned, sterilized crab shells, individually wrapped, packed in containers and frozen.

The evidence established that the crab cakes and deviled crabs contained between 45% and 55% non-aquatic matter and that their production constituted approximately 10% to 14% of the defendant's total output.

One additional fact established by the evidence should be noted relating to all of the defendant's products: These products, when compared with other similar products produced by different concerns, contain an average or slightly below average percentage of breading material and their overall quality is very high.

The Supreme Court of the United States has made a definitive statement regarding the weight to be given administrative interpretative opinions in a District Court. In Skidmore v. Swift & Co., 323 U.S. 134, at pp. 139, 140, 65 S.Ct. 161, at p. 164, 89 L.Ed. 124 (1944) the court said:

"There is no statutory provision as to what, if any, deference courts should pay to the Administrator's conclusions. And, while we have given them notice, we have had no occasion to try to prescribe their influence. The rulings of this Administrator are not reached as a result of hearing adversary proceedings in which he finds facts from evidence and reaches conclusions of law from findings of fact. They are not, of course, conclusive, even in the cases with which they directly deal, much less in those to which they apply only by analogy. They do not constitute an interpretation of the Act or a standard for judging factual situations which binds a district court's processes, as an authoritative pronouncement of a higher court might do. But the Administrator's policies are made in pursuance of official duty, based upon more specialized experience and broader investigations and information than is likely to come to a judge in a particular case. They do determine the policy which will guide applications for enforcement by injunction on behalf of the Government. Good administration of the Act and good judicial administration alike require that the standards of public endorsement and those for determining private rights shall be at variance only where justified by very good reasons. The fact that the Administrator's policies and standards are not reached by trial in adversary form does not mean that they are not entitled to respect. This Court has long given considerable and in some cases decisive weight to Treasury Decisions and to interpretative regulations of the Treasury and of other bodies that were not of adversary origin.

"We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."

It is in this light that we must examine the validity of the Department of Labor's interpretation that any product, regardless of its apparent nature, is not an aquatic form of animal or vegetable life if, after processing, it contains more than 20% non-aquatic material, no matter how insignificant the addition of the non-aquatic material might be in determining the inherent nature and identity

of the final product. For a number of reasons I am not persuaded of the validity of the Regulation.

■ First, from a basic common sense point of view the interpretation simply does not seem to follow the plain meaning of the statutory mandate. The statute plainly encompasses the processing of living organisms which are taken from the sea. And so long as the processes involved are directed *primarily* at those sea organisms (though non-aquatic matter may be incidentally added), and not at a number of non-aquatic organisms in equal or nearly equal conjunction with those from the sea, the processes should be within the statutory exemption. The percentage of non-aquatic material added to the sea organisms during the course of processing should certainly be a relevant element in determining whether a company is processing organisms from the sea within the meaning of the statute or is simply using them as one component in a process that creates a non-exempt product containing sea organisms in it. However the percentage of aquatic matter in the finished product cannot fairly be adopted as the *only relevant one*, regardless of the attractiveness such a definite test might have for those charged with the enforcement of the statute. All of the defendant's products in this case retain a constant identity from the time they arrive at the defendant's plant until they are packaged for market. The oysters arrive as oysters and leave as oysters, regardless of the addition of non-aquatic material. Likewise the scallops, the shrimp and the fish portions. To their seafood core has been added an incidental layer of breading which makes them more readily cookable' and therefore marketable but which does not alter their identity as processed seafood. The crab cakes and deviled crabs present a slightly more difficult case and approach more closely to the place where the statutory line ought to be drawn, perhaps partly because their percentage of non-aquatic material is higher, but not wholly for that reason. The higher number of non-aquatic products added is another factor which creates doubts, as does the possibility of such products as onions, parsley, and pepper being used in equal or near equal conjunction with the crabmeat in the final product rather than as secondary flavor additions. However, the testimony indicates that the cream sauce is added to highlight the flavor of the crab meat and to make it malleable and coherent for cooking. The breading is added to the crab cakes, as it is to all these products, to make them cook and taste better. Therefore I am of the opinion that the crab cakes and deviled crabs produced by the defendant are within the statutory exemption.

■ A second reason for declaring the Labor Department's interpretation invalid is that by excluding the defendant and concerns doing the same type of processing it does not seem to carry out the Congressional intent of the statute. For it is conceded by everyone concerned with this case that the primary purpose of the seafood exemption was to make allowances for an industry which is seasonal in nature and which deals with highly perishable commodities, thus demanding long hours as unpredictable as the run of the fish and offering no work for long slack periods; and therefore manifestly not suited to the conventional eight hour day and forty hour week. The plaintiff even has a sub-heading of its brief entitled:

"A. The fishery exemption applies only to those shore operations which must be performed promptly after the catch is brought in, in order to avoid spoilage."

The evidence in this case shows that well over half of defendant's processing operations are performed on highly perishable seafood products and that its largest single product, and its most perishable, oysters, can be successfully processed only by taking large quantities of raw oysters from the shucking houses *when they are in season* (or "running", although that term does not seem quite appropriate when applied to oysters). So, in part at least, the defendant is

clearly within the announced purpose of the exemption.

Additionally, in the seafood exemption up until 1961 the term "processing" was not qualified in any way, while during the same period another exemption relating to agriculture used the term "first processing".

In Mitchell v. Trade Winds Company, 289 F.2d 278 at p. 281 (5th Cir. 1961), a case virtually on all fours with this one and holding as this court does, the court made the following comment on this situation:

> "Giving the administrative interpretation, together with the legislative history, such weight as they deserve, we find that they are not sufficient to permit us to assign to the word 'processing' any meaning that is more restricted than is ordinarily ascribed to it. It is to be noted that the Wage and Hour law itself makes a distinction between 'first processing,' and 'processing.' Section 7(c) of the Act grants an agricultural exemption in connection with 'first processing.' For reasons sufficient to Congress, the exemptions here are to processing generally and are not restricted as is the case under Section 7(c). In his brief before us the Secretary says:
>
> > " 'The term "processing" is not defined in the Act. It is clear, however, that the term is not used in Section 13(a) (5) in its fullest possible connotation.'
>
> "In view of the distinction made by Congress itself where it sought to limit the generality of meaning of the word by exempting only the first processing in other sections of the law, we cannot agree with this argument that Congress did not mean whatever is normally comprehended within the meaning of the word 'processing' which it used here."

I agree with this analysis. And all the more so because in 1961 Congress changed the term in § 213(a) (5) to "first processing", indicating a desire to narrow the scope of the exemption.

A third and final reason for rejecting the Labor Department's interpretation is that it is absolutely unsupported by any legal precedent that is directly in point, while Mitchell v. Trade Winds, supra, which, though dealing only with breaded shrimp, decides the exact issue before this Court, holds that the Labor Department's interpretation is invalid. To demonstrate the legal weakness of the plaintiff's position one need look no further than the cases which it cites in its own Interpretative Bulletin on the seafood exemption to support the principle that a processed seafood product does not fall within the exemption if it contains a substantial amount of non-aquatic matter. (See 29 C.F.R. Part 784:110) Both these cases, Walling v. Bridgeman-Russel Co., 6 Labor Cases (CCH) ¶ 61,422 (U.S.D.C., Minn.1942) and Miller v. Litchfield Creamery Co., 11 Labor Cases (CCH) ¶ 63,247 (U.S.D.C.Ind.1944), deal with the term "first processing" found in the agricultural exemption already discussed, which of course is not present in the pre-1961 seafood exemption. It is true that in the Bridgeman-Russel Co. case the court included some dicta which said that "The term 'first processing' * * * does not include manufacturing operations in which substantial quantities of other products are used; * * *" This the Litchfield court amplified in a dicta of its own which showed a good deal of insight: "The percentage of ingredients used in relation to the whole product is not the only or the real test of whether the other ingredients are or are not added to a substantial extent." The plaintiff obviously paid little heed to this wise admonition.

The plaintiff relies heavily on the case of Fleming v. Hawkeye Pearl Button Co., 113 F.2d 52 (8th Cir. 1940). It is not in point. As the Trade Winds court said, 289 F.2d at 282:

> "There is nothing in Fleming v. Hawkeye Pearl Button Co., 8 Cir., 113 F.2d 52, that is inconsistent with our holding here. The decision by

that Court that the manufacturer (*sic*) of pearl buttons did not constitute processing of crustacea is too plain to require the broad reasoning which that Court indulged in to arrive at its decision. The making of pearl buttons out of oyster shells constituted a processing of the 'crust' instead of the 'crustacea.' It obviously did not fall within the exemption."

The other cases cited by the plaintiff are not persuasive since they do not deal with the point at issue.

Therefore, following the legal authority of the Trade Winds case and for the reasons stated in this opinion, this Court holds that the Labor Department's interpretation of the pre-1961 § 213(a) (5) and of the present § 213(b) (4) is invalid as it applies to this defendant and that no injunction will be issued against the defendant.

There are a couple of matters left to be cleared up:

1) Since it appears that with regard to its office employees the defendant has always complied with the minimum wage and overtime provisions of the Act and the only alleged violation of the Act with regard to those employees was an inadvertent record keeping lapse which has since been corrected,[6] the ruling of this Court does not apply to defendant's office employees, although from a reading of McComb v. Consolidated Fisheries Co., 174 F.2d 74 (3d Cir. 1949), it would appear that they should be just as exempt as the assembly line employees.

2) Plaintiff offered in evidence some intra-departmental correspondence, designed to show the Labor Department's consistent approach regarding the 20% rule, to which the defendant objected. Although the defendant may be technically right in his objection, in the absence of a jury the letters have been admitted

for what they are worth as proof of plaintiff's contention. The court is of the opinion that they do not establish a constant official opinion of the Labor Department. This could have been done by the publication of an official interpretative bulletin. It was not. Furthermore, even if these letters did establish a consistent official interpretation of the statute, such consistency would not succeed in persuading this Court that the interpretation was correct in the light of the statutory language involved.

In accordance with this opinion an order will be entered denying the injunction.

and must hereafter keep the required record. There is therefore no occasion to issue an injunction because of a difference of opinion as to the effect of the Act in its earlier form.

---

6. Since the defendant admits that it is now no longer exempt from § 206 of the Act it is clear that all parties to this litigation concede that the defendant is an "employer subject to any provision of this chapter" (29 U.S.C.A. § 211(c))