FLEMING, Administrator of the Wage and Hour Division, United States Department of Labor, v. AMERICAN STORES CO.

No. 1912.

District Court, E. D. Pennsylvania.

Dec. 30, 1941.

Gerard D. Reilly, Sol., and Irving J. Levy, Asst. Sol., both of Washington, D. C., in Charge of Litigation, J. M. Gallagher, Regional Atty., of Philadelphia, Pa., Abner Brodie, of Washington, D. C., Ern-

est N. Votaw, of Philadelphia, Pa., and A. A. Cohen, of Cleveland, Ohio, for plaintiff.

Joseph Gilfillan, of Philadelphia, Pa., for defendant.

KALODNER, District Judge.

What is a "retail establishment" within the meaning of section 13(a) (2) of the Fair Labor Standards Act of 1938[1]?

Specifically, is a $33,000,000 chain store organization, employing more than 14,000 workers, with gross annual sales of $115,000,000, which directly and through wholly-owned subsidiaries operates 2,300 retail grocery stores and eleven warehouses in seven states and the District of Columbia, along with food-processing and manufacturing plants, etc., a "retail establishment"?

That is the paramount issue involved in this action brought by the Administrator of the Wage and Hour Division, United States Department of Labor, against the American Stores Company, a Delaware corporation.[2]

Section 13(a) (2) of the Act grants an exemption from the minimum wage provisions of section 6 and the maximum hours provision of section 7, as follows:

"The provisions of sections 6 and 7 [sections 206 and 207] shall not apply with respect to * * * any employee engaged *in any retail* or service *establishment* the greater part of whose selling or servicing is in intrastate commerce * * *." (Emphasis supplied.)

The contentions of the parties as to the issue stated may be briefly summarized as follows:

*Plaintiff's Contentions:*

That each unit of defendant's enterprises constitutes *a separate establishment* within the meaning of section 13(a) (2) and only the employees working in the 2300 retail stores are engaged in *a retail establishment* within the meaning of the exemption; and that the exemption provided by section 13(a) (2) is inapplicable to defendant's employees at its warehouses, manufacturing or proces-

sing plants, main office, or other non-retail selling units.

*Defendant's Contentions:*

That the entire business of the American Stores Company of Delaware, and its subsidiaries, including the 2300 stores, warehouses, bakeries, manufacturing and processing operations, main offices, printing and multigraphing plant, transportation facilities, and repair and machine shops, constitutes *a single "retail establishment"* whose primary business is selling at retail in intrastate commerce, and as such is exempt under section 13(a)(2).

The record discloses that the defendant is engaged in the purchase, production, distribution and sale of food and other general grocery items. In addition to the stores and warehouses previously mentioned, it operates seven bakeries in three states, two canneries in Maryland, and a coffee-roasting plant, automobile maintenance shop, bottling works, and a food-processing and manufacturing plant, etc. It maintains purchasing offices in Philadelphia and New York.

The defendant is the sole owner of all the stock of American Stores Company of Pennsylvania; American Stores Company of New Jersey; American Stores Company of Maryland; American Stores Company, Inc., of Virginia; American Stores Company of West Virginia; Acme Markets, Inc. (which became inactive January 1, 1940); American Stores Dairy Company; United States Coffee Corporation; American Stores Produce Company, and the Stores Realty Company.

The defendant's 2,300 retail stores and retail food markets are located in Pennsylvania, New Jersey, Delaware, Virginia, West Virginia, New York, Maryland, and the District of Columbia. The defendant makes virtually all purchases for the requirements of stores of its subsidiaries, as well as its directly-owned stores.

The retail stores are operated under a common general management, but the identity and operations of each is separate and distinct under the defendant's system of ac-

---

[1] Act of June 25, 1938, c. 676, 52 Stat. 1060, 29 U.S.C. § 201 et seq., hereinafter referred to as the Act.

[2] The employees in the 2,300 retail stores are not involved in the present action, it being agreed they are engaged in a local retailing capacity under section 13(a) (1) of the Act.

Section 13(a) (1) of the Act provides: "The provisions of sections 6 and 7 [sections 206 and 207] shall not apply with respect to (1) any employee employed in a bona fide * * * local retailing capacity * * *."

counting. Individual and detailed records are kept with respect to each store, and the profit or loss of each store is computed periodically. The expenses of each store are borne by it alone. The cost of operation of a particular warehouse or bakery is apportioned only among the stores which it serves. Only general overhead expenses, such as cost of operation of the main offices of defendant (including salaries of officers) are apportioned among all the stores, based on their gross sales.

The defendant's main office at Philadelphia, with some 400 employees, is the headquarters for the purchase of merchandise for all the stores; for advertising, accounting, sales promotion, etc.

The defendant employs a total of 3,200 workers in the operation of its offices, warehouses, manufacturing and processing plants, bakeries, transportation facilities, repair and machine shops, printing and multigraphing plant, and other non-retail selling units. The 400 main office employees are included in this total. All of these 3,200 employees perform duties which are an integral part of the operation of these units.

The seven states and the District of Columbia in which the defendant and its subsidiaries operate retail stores are divided into zones, each of which is served by a different warehouse. Each of the defendant's warehouses (excepting warehouse No. 3, which is the coffee-roasting plant) constitute distribution centers through which pass food and grocery products delivered from all parts of the United States by the common forms of interstate transportation. The goods are unloaded at the warehouses, stacked, and then forwarded to the retail stores. Each retail store is debited for the cost of the merchandise, plus freight, in addition to the overall charges of the servicing warehouse and the main office expense previously mentioned.

All of the warehouses, except those at Newark and Orange, New Jersey; Wilkes-Barre, Pennsylvania; and Syracuse, New York, distribute goods to retail stores in other states. Seventy to eighty per cent of the products from independent sources passing through each warehouse come from outside the particular state in which the warehouse is located. Substantially all of the goods received at the warehouses are shipped to stores in the original packages. The defendant's warehouses perform essentially the same functions as those performed by independent wholesale grocers, and their mode of operation is substantially the same.

It may be noted here that during 1939 the defendant supplied groceries, etc., amounting to approximately $31,000,000 to the American Stores Company of Virginia; American Stores Company of West Virginia; and Acme Markets, Inc., of Delaware, its three wholly-owned subsidiaries. These subsidiaries, incidentally, filed separate tax returns and paid separate income and license taxes. Separate books were maintained for each corporation. Separate balance sheets and profit and loss statements were also kept.

The seven bakeries operated by the defendant in three states had an output of approximately $2,250,000 during 1939. The bulk of the raw materials received at the bakeries came through interstate shipments. All of the bakeries, with the exception of those at Wilkes-Barre and Harrisburg, Pennsylvania, and Syracuse, New York, distribute their products through interstate commerce to the retail stores.

Evidencing the tremendous extent of the processing activities of the defendant, warehouse No. 4 in Philadelphia also houses a manufacturing, processing and packing plant in which salad dressings, jams, and delicatessen items, bacon, beef, and meats are prepared and packed for all the stores. These operations alone totaled more than $8,000,000 in 1939.

Operations in the coffee-roasting plant, warehouse No. 3 previously mentioned, totaled almost $2,000,000 in 1939.

Output of the defendant's wholly-owned cannery in Hurlock, Maryland, exceeded $500,000 during 1939. The output of the Havre de Grace, Maryland cannery in 1939, which was operated under a contract system, amounted to $175,000. The bulk of the products of both these canneries was shipped to stores outside of Maryland.

The defendant's assets at the end of 1939 amounted to $32,662,976 and total sales by retail stores for the same year were $114,-824,009. Of the latter total, sales by defendant's directly-owned stores were $77,014,-652 and sales by stores of wholly-owned subsidiaries were $37,809,357.

As already stated, the suit results from the contention of the Wage and Hour Administrator that all of the employees of the defendant employed in its non-retail selling units, such as warehouses and processing plants, delivery service, main office, etc., are engaged in interstate commerce within the meaning of the Act, and are therefore entitled to the benefits of sections 6 and 7 thereof.

Parenthetically, it may be stated that the defendant admits that the employees in seven[3] of its eleven warehouses are engaged in interstate commerce, and raises the question only that the remaining four[4] are not engaged in interstate commerce.

In addition to contesting the suit on the broad premise that it is a "retail establishment", the defendant denies that many of its employees (in warehouses, offices and maintenance units) are engaged in interstate commerce or in the production of goods for interstate commerce, and specifically asserts that many main office workers are employed in connection with the retail stores only, and further that the employees in its Wilkes-Barre, Pennsylvania; Orange, New Jersey; Newark, New Jersey; and Syracuse, New York, warehouses are engaged in intrastate commerce, because those plants do not serve stores outside the states in which they are located.

The complaint specifically seeks to enjoin the defendant from violating sections 15(a) (1), 15(a) (2) and 15(a) (5) of the Act.

Section 15(a) (1) makes unlawful the shipment in interstate commerce of any goods "in the production of which any employee was employed in violation of sections 6 or 7 [section 206 or 207]".

Section 15(a) (2) provides that it shall be unlawful for any person to violate any of the provisions of sections 6 or 7 of the Act.

Section 6 requires employers to pay employees engaged in interstate commerce or in the production of goods for interstate commerce according to a certain wage scale.

Section 7 fixes the maximum hours.

Section 15(a) (5) makes it unlawful for an employer subject to the Act to violate section 11(c), or to make any statement, report, or record filed or kept pursuant to such section or any regulation issued thereunder, knowing such statement, report, or record to be false in a material respect.

Section 11(c) provides for the keeping of accurate records of the wages and hours of the employees.

The parties have stipulated[5] that the defendant has not complied with sections 6, 7 and 11(c) of the Act with reference to the employees in all the warehouses, etc.

Essentially, the suit results from the refusal of the defendant to subscribe to the Wage and Hour Division's interpretation of the words "retail establishment" as used in section 13(a)(2).

First as to the primary issue in this case: What is a "retail establishment"?

In Interpretative Bulletin No. 6 of the Wage and Hour Division, United States Department of Labor, issued December 1938, captioned "Retail and Service Establishments—The scope and applicability of the exemption provided by section 13(a) (2) of the Fair Labor Standards Act of 1938", a "retail establishment" is defined in part as follows:

"6. A retail establishment sells merchandise to the ultimate consumer for direct consumption and not for purposes of resale in any form. The transactions of sale may take place in the home of the consumer, by mail, by telephone or, most commonly, in retail shops or stores. The neighborhood butcher shop which sells meat to housewives is a typical example of a retail establishment.

\*    \*    \*    \*    \*

---

[3] *Warehouse*

| | Location |
|---|---|
| Number 1 | Philadelphia, Pennsylvania |
| " 2 | " " |
| " 3 | " " |
| " 4 | " " |
| ". 6 | Baltimore, Maryland |
| " 8 | Washington, D. C. |
| " 9 | Johnstown, Pennsylvania |

[4] *Warehouse*

| | Location |
|---|---|
| Number 5 | Wilkes-Barre, Pennsylvania |
| " 7 | Orange, New Jersey |
| " 7 | (produce) Newark, New Jersey |
| " 10 | Syracuse, New York |

[5] The Stipulation provides:

(a) "Defendant has employed a number of its employees (1) for workweeks longer than 44 hours during the first year from the effective date of section 7 of the Fair Labor Standards Act of 1938 (Oct-ber 24, 1938), (2) for workweeks longer than 42 hours during the second year from such date, and (3) for workweeks longer than 40 hours after the expiration of the second year from such date, without such employees receiving compensation for their employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which they were employed"; and that

(b) "Defendant has not made, kept and preserved records specified under section 11(c) of the said Act, and Regulations, Part 516, Chapter V, Code of Federal Regulations, for any employees who may be found to be entitled to compensation in accordance with the provisions of sections 6 and 7 of the said Act".

"17. The unit store will ordinarily constitute the retail or service 'establishment' contemplated by the exemption, even though it may be operated as a concession in a hotel, railroad station, or general market. In such cases, the structure of the enterprise is relatively simple and the independent ownership of the particular store or shop will usually be the determining consideration.

"18. The question has been raised as to the scope of the term 'establishment' in the case of chain-store systems, branch stores, groups of independent retailers organized to carry on business in a manner similar to chain-store systems, and retail or service outlets of large manufacturing or distributing concerns. In the ordinary case, each physically separated unit or branch store will be considered a separate 'establishment' within the meaning of the exemption."

The Wage and Hour Division concedes that the Act confers no authority upon the Wage and Hour Administrator to extend or restrict the scope of section 13(a) (2), or even to impose legally binding interpretations as to its meaning. Interpretative Bulletin 6, supra, specifically makes the statement in Paragraph 2 that:

"This bulletin is merely intended to indicate the construction of the law which will guide the Administrator in the performance of his administrative duties unless he is directed otherwise by the authoritative ruling of the courts or unless he shall subsequently decide that his prior interpretation is incorrect."

The practice of issuing "interpretations" by governmental agencies is well-established. The necessity of publishing interpretative bulletins by agencies such as the Wage and Hour Division is patently apparent. This is particularly so in view of the tremendous scope of the Act, affecting as it does millions of employees and literally hundreds of thousands of employers.

The Supreme Court of the United States, in United States v. American Trucking Ass'ns, Inc., 310 U.S. 534, 549, 60 S.Ct. 1059, 1067, 84 L.Ed. 1345, in speaking of interpretations by the Administrator, stated: "In any case such interpretations are entitled to great weight. This is peculiarly true * * * where the interpretations involve 'contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of mak-

ing the parts work efficiently and smoothly while they are yet untried and new.' "

The problem presented in this case is one of first impression with respect to chain store organizations such as the defendant's, and, in the final analysis, involves the legislative intent of the Congress as to what it meant by a "retail establishment".

■ At the outset, it must be kept in mind that the defendant seeks to avoid compliance with the Act solely under the exemption in section 13(a)(2). Under general principles of statutory construction exemptions from a general or remedial statute, such as the Fair Labor Standards Act, must be *strictly* construed. That the Act is remedial in nature is established by United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430, in which the Supreme Court of the United States upheld its constitutionality; and Opp Cotton Mills, Inc., v. Administrator, 312 U.S. 126, 61 S.Ct. 524, 85 L.Ed. 624.

In Bowie v. Gonzalez, 117 F.2d 11, 16, the United States Circuit Court of Appeals for the First Circuit makes this statement: "The purpose of the Act is to eliminate from industries engaged in commerce or in the production of goods for commerce the existence of labor conditions detrimental to the maintenance of the minimum standard of living necessary for the health, efficiency and general well-being of workers in such industries and production in order to prevent disruption of such commerce. Such unfavorable conditions are produced by low wages and long hours, and the Act is designed to cure those evils. *The statute is remedial in nature and should be liberally construed.* Fleming v. Hawkeye Pearl Button Co. [8 Cir., 113 F.2d 52]; cf. Jeffery-De Witt Insulator Co. v. National Labor Relations Board, 4 Cir., 1937, 91 F.2d 134 [112 A.L.R. 948], certiorari denied, 1937, 302 U.S. 731, 58 S.Ct. 55, 82 L.Ed. 565." (Emphasis supplied.)

In discussing the rule that exemptions from the provisions of a remedial statute must be *strictly* construed, the court in Bowie v. Gonzalez, supra, 117 F.2d at page 16, stated: "The scheme of the statute is broad and comprehensive with the obvious purpose of including all employees in interstate commerce except those specifically excepted. In the instant case, the appellants claim specific exemption from the wage provisions of the Act. Being a remedial statute, the appellants must bring themselves

within both the letter and spirit of the exceptions since they are subject to a *strict* construction. Fleming v. Hawkeye Pearl Button Co., supra; cf. Morris Canal [& Banking] Co. v. Baird, 1915, 239 U.S. 126, 36 S.Ct. 28, 60 L.Ed. 177; Citizens' Bank v. Parker, 1904, 192 U.S. 73, 85, 24 S.Ct. 181, 48 L.Ed. 346." (Emphasis supplied.)

The Circuit Court of Appeals for the Eighth Circuit, in Fleming v. Hawkeye Pearl Button Co., supra, 113 F.2d at page 56, said:

"The manifest declared purpose of the statute was to eradicate from interstate commerce the evils attendant upon low wages and long hours of service and industry. Accepting this as the declared purpose of the Act, exemptions would tend to defeat its purpose. The statute is remedial, with a humanitarian end in view. It is therefore entitled to a *liberal* construction. Grier v. Kennan, 8 Cir., 64 F.2d 605. * *

"Section 13(a)(5) creates an exception to the general scope of the Act, and hence is subject to *strict* construction. Thompson v. United States, 8 Cir., 258 F. 196; United States v. Maryland Casualty Co., 7 Cir., 49 F.2d 556; United States v. Dickson, 15 Pet. 141, 165, 10 L.Ed. 689. In the last cited case it is said: 'In short, a proviso carves special exceptions only out of the enacting clause; and those who set up any such exception, must establish it as being within the words as well as within the reason thereof.'

"This rule of construction is applicable even though the statute contains certain penal provisions. Here no penalties are sought to be enforced but remedies. In such circumstances, exemptions should be construed *strictly*. Smith v. Townsend, 148 U.S. 490, 13 S.Ct. 634, 37 L.Ed. 533." (Emphasis supplied.)

To the same effect as the above was Wood v. Central Sand & Gravel Co., D. C., 33 F.Supp. 40, where the court, in denying a claim for exemption under section 13(a)(2), construed the provision narrowly.

█ The decisions establish that the burden is upon the defendant to show affirmatively that its contention comes within the language of the exemption of section 13(a)(2).

█ I stated earlier that the meaning to be accorded to the words "retail establishment" involves the legislative intent. Accordingly, an examination of the legislative history of the Act becomes imperative to ascertain the legislative intent.

In United States v. Darby, supra, the Supreme Court of the United States specifically considered (312 U.S. at page 109, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430) the reports of Congressional committees proposing the Act and its legislative history.

The most recent instance of resort to the legislative history, to ascertain the intent of the lawmakers, may be found in Maguire et ux. v. Commissioner of Internal Revenue, 313 U.S. 1, 61 S.Ct. 789, 85 L. Ed. 1149, in which the Supreme Court of the United States reviewed the legislative history of the Revenue Act of 1928, 45 Stat. 791, 26 U.S.C.A. Int.Rev.Acts, page 345 et seq.

In Fleming v. A. B. Kirschbaum Co., 124 F.2d 567 the United States Circuit Court of Appeals for this Circuit on December 17, 1941, considered the legislative history of the Act.

█ The legislative history of section 13(a)(2) prior to the enactment of the Act indicates that the Congress intended the exemption to apply typically to such commonly recognized retail and service businesses as grocery stores, butcher shops, laundries, etc.

The original bill, H.R. 7200, S.2475, introduced May 24, 1937, made no mention of any limitation or exemption with respect to retail or service establishments. Mr. Justice Jackson, now a member of the Supreme Court of the United States, and then Solicitor General, at the first hearing on the bill, stated: "It was not intended by this bill to apply generally to retailers or to apply to the service trades, such as the filling-station attendant, and the pants presser and small business. In fact, there is in it a provision which provides for the exemption of businesses which have a number of employees below some certain figure which the Congress of course may fix." Joint Hearings Before Senate and House Labor Committees (75th Congress) on S. 2475 and H.R. 7200, June 1937, p. 35.

The Senate Committee Bill, introduced July 8, 1937, contained the following provision (section 2(a)(7) ): "Employee shall not include any person employed in a local retailing capacity as defined and delimited by regulations of the board."

This bill omitted the provision for exempting small employers. An amendment from the Senate floor to replace this exemption was rejected. 81 Cong.Rec. 7887-7888.

The third House Committee Bill introduced April 21, 1938, contained a provision in section 6 that the Secretary of Labor should hold hearings and issue an order of coverage if the Secretary should find: "(a) that the activities of such industry are Nationwide in their scope, or (b) that such industry is dependent for its existence upon substantial purchases or sales of goods in commerce and upon transportation in commerce, or (c) that the relation of such industry to commerce is in other respects close and substantial."

Three amendments were offered to section 6 expressly aimed at exempting retailing. Two proposed amendments expressly were intended to exclude stores purchasing goods from outside of the state. They were defeated. A third amendment offered by Representative Celler of New York provided that no order of the Secretary "shall be applicable to any retail industry the greater part of whose selling is in intrastate commerce." Representative Celler stated (83 Cong. Rec. 7437, 7438) that the amendment was intended to dispel doubt about the exemption applicable to retailing and that if accepted "retail dry goods, retail butchering, grocers, retail clothing stores, and department stores will all be exempt." This amendment was passed by the House. After its passage Representative Johnson of Oklahoma stated that the amendment was intended "to protect the little corner store, filling station and other retailers who purchase a substantial part of their goods across the state line."

The Celler amendment just discussed, with its exemption of "any retail industry" was never enacted. The word "establishment" was substituted for the word "industry" in the final legislation and it is significant that this substitution was made.

The retail exemption was inserted in section 13(a) in conference. The language of section 13(a) (2) was never discussed on the floor of the House or Senate, as far as I can ascertain. The exemption in substantially its present form, as was pointed out by the complainant's brief, appears for the first time in the confidential conference committee prints (June 10, 11, 12, 1938, respectively). These confidential drafts contained an exemption which provided that the wage and hour provisions shall not apply with respect to "any employee engaged in any retail establishment the greater part of whose selling is in intrastate commerce." In the final Conference

Report (Report No. 2738, June 11, 1938) the words "or service" and "or servicing" were added. Thus, the first public draft of section 13 (a) (2) in the final conference report was identical with the language of section 13(a) (2) as enacted.

The Conference Report under the subdivision "Exemption" stated, in explaining the Conference Agreement (ibid., p. 32): "Section 13 of the conference agreement contains the same exemptions in the House amendment with the following changes and additions: (1) It includes an exemption from both the wage and hour provisions of employees of retail and service establishments the greater part of whose business is in intrastate commerce."

The above is the sum total of the ascertainable legislative history of section 13(a) (2).

It is interesting to note what has happened in the Congress since the enactment of the Act with relation to section 13(a) (2). On May 11; 1939, an amendment was offered to exempt employees of wholesalers from the overtime provisions of the Act. 84 Cong. Rec. 5475. On June 5, 1939, the sponsor of the amendment, in discussing it in the House, specifically referred to its application to employees of distributors of food stuffs. 84 Cong. Rec. 6633. The proposed amendment failed of enactment.

Almost a year later, on April 30, 1940, an attempt was made to exempt employees of wholesale distributors of agricultural food products. 86 Cong. Rec. 8074 Unbound Ed. The amendment was defeated. It was introduced on May 2, 1940, and again defeated. 86 Cong. Rec. 8439, 8463.

At this point it is appropriate to discuss briefly the legislative intent with respect to the Fair Labor Standards Act in its entirety. Section 2(a) of the Act, "finding and declaration of policy", reads as follows:

"Sec. 2 [§ 202]. (a) The Congress hereby finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3)

constitutes an unfair method of competition in commerce; (4) Leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce."

In an admirably succinct statement, Mr. Chief Justice Stone of the United States Supreme Court, in United States v. Darby, supra, 312 U.S. at pages 109, 110, 61 S.Ct. at page 454, 85 L.Ed. 609, 132 A.L.R. 1430, summarized the scope of the Act and the legislative intent with respect to it as follows:

"The Fair Labor Standards Act set up a comprehensive legislative scheme for preventing the shipment in interstate commerce of certain products and commodities produced in the United States under labor conditions as respects wages and hours which fail to conform to standards set up by the Act. Its purpose, as we judicially know from the declaration of policy in § 2 (a) of the Act, and the reports of Congressional committees proposing the legislation, S. Rept. No. 884, 75th Cong. 1st Sess.; H. Rept. No. 1452, 75th Cong. 1st Sess.; H. Rept. No. 2182, 75th Cong. 3d Sess., Conference Report, H. Rept. No. 2738, 75th Cong. 3d Sess., is to exclude from interstate commerce goods produced for the commerce and to prevent their production for interstate commerce, under conditions detrimental to the maintenance of the minimum standards of living necessary for health and general well-being; and *to prevent the use of interstate commerce as the means of competition in the distribution of goods so produced, and as the means of spreading and perpetuating such substandard labor conditions among the workers of the several states.*" (Emphasis supplied.)

Application of the Supreme Court's statement to the instant problem effectively disposes of the defendant's contention that the entire "business" of the defendant is exempt as a "retail establishment" under the provisions of section 13(a) (2) of the Act.

The defendant admits that seven of its eleven warehouses are engaged in interstate commerce or in the production of goods for interstate commerce. Defendant's Reply Brief, p. 12.

It is patent that the cost of operation of these seven warehouses is reflected in the cost of operation of the retail stores which they serve, since each retail store is debited by the defendant with the overall charges of the servicing warehouse. The prices charged by the defendant's retail stores for the commodities which they sell are affected by the operating cost of the stores which, in turn, reflect the operating cost of their servicing warehouse. Thus it is apparent that the labor conditions, wages and hours, which prevail in the servicing warehouses affect the retail stores which they admittedly service in interstate commerce. In United States v. Darby, supra, the Supreme Court stated (312 U.S. at page 115, 61 S.Ct. at page 457, 85 L.Ed. 609, 132 A.L.R. 1430):

"The motive and purpose of the present regulation [the Act] are plainly to make effective the Congressional conception of public policy that interstate commerce should not be made the instrument of competition in the distribution of goods produced under substandard labor conditions, which competition is injurious to the commerce and to the states from and to which the commerce flows."

Again, 312 U.S. on pages 122, 123, 61 S.Ct. on page 461, 85 L.Ed. 609, 132 A.L.R. 1430, the court said:

" * * * As we have said the evils aimed at by the Act are the spread of substandard labor conditions through the use of the facilities of interstate commerce for competition by the goods so produced with those produced under the prescribed or better labor conditions; and the consequent dislocation of the commerce itself caused by the impairment or destruction of local businesses by competition made effective through interstate commerce.

" * * * The means adopted by § 15(a) (2) for the protection of interstate commerce by the suppression of the production of the condemned goods for interstate commerce is so related to the commerce and so affects it as to be within the reach of the commerce power. See Currin v. Wallace, 306 U.S. [1], 11, 59 S. Ct. [379], 385, 83 L.Ed. 441. Congress, to attain its objective in the suppression of nationwide competition in interstate commerce by goods produced under substandard labor conditions, has made no distinction as to the volume or amount of shipments in the commerce or of production for commerce by any particular shipper or producer. It recognized that in present day industry, competition by a small part may affect the whole and that the total effect of the competition of many small

producers may be great. See H. Rept. No. 2182, 75th Cong. 1st Sess., p. 7. The legislation aimed at a whole embraces all its parts. Cf. National Labor Relations Board v. Fainblatt, 306 U.S. [601], 606, 59 S.Ct. [668], 671, 83 L.Ed. 1014."

The defendant here makes the ingenuous contention that a chain store system which admittedly, in large part (as far as its warehouses are concerned), operates in interstate commerce, is exempt as a "retail establishment" because "the defendant is primarily a retailer, the greater part of whose selling is in interstate commerce", that is, the ultimate distribution to the public is by retail stores which sell intrastate.

That argument fails and falls by its own weight. The typical retail establishments such as "grocery stores" referred to in Fleming v. A. B. Kirschbaum Co., supra, pay to the wholesalers from whom they buy, prices which are affected by the labor costs of the wholesalers; and the cost of these wholesalers inevitably reflects the cost of operating their own warehouses. Since wholesalers who sell in interstate commerce to non-chain store grocery stores and meat shops, which are engaged in competition with the stores operated by the defendant, are compelled to comply with the Act, an exemption of similarly operated warehouses would result in a burdensome differential to the complying warehouses and their customer retail stores.

Additionally, a differential in labor costs would weigh heavily against the wholesalers and public warehouses which perform functions analogous to and in competition with the chain store warehouses. Public warehouses which serve in interstate commerce must comply with the provisions of the Act, as must wholesale grocers engaged in interstate commerce. In fact, in the instant case, the record discloses that the defendant on many occasions used public storage facilities and, on the occasion of a strike situation last year, made substantial purchases from wholesale grocers who operate their own warehouses.

It is pertinent to make note here of the fact that while a considerable portion of the defendant's hauling is performed by contract carriers, that at many of its warehouses it operates its own trucks. If the defendant, under section 13(a) (2), were exempt, it would be given a competitive advantage.

The defendant's contention that it is a "single retail establishment" is made in face of the fact that during 1939 it supplied merchandise amounting to $31,000,-000 at wholesale to the retail stores operated by the American Stores Company of Virginia, the American Stores Company of West Virginia, and Acme Markets, Inc., of Delaware. These three corporations, it will be recalled, are wholly-owned subsidiaries of the defendant which operate retail stores in Virginia, West Virginia, Pennsylvania, New York, Maryland, New Jersey, Delaware, and the District of Columbia. As previously mentioned, the Virginia and West Virginia corporations, and the Acme Markets, Inc., of Delaware (which became inactive January 1, 1940) operated as distinct and separate corporations. Separate books were kept for each corporation. They maintained separate bank accounts in which the proceeds of sales were deposited, although the funds were subsequently transferred to the defendant's bank account. They filed separate tax returns, and income and license taxes. They leased the stores which they operated. They had separate balance sheets, and profit and loss statements. They were treated by the defendant as separate corporate entities. Merchandise supplied to them was charged as an advance. In the case of Acme Markets, Inc., of Delaware, which was organized for manufacturing as well as for wholesale and retail selling, it directly operated 296 establishments in several states at the close of 1939. Acme Markets, Inc., during that year was supplied with merchandise by the defendant's warehouses, bakeries, canneries, and manufacturing plants in other states. These 296 stores operated by Acme Markets, Inc. were located as follows:

| | |
|---|---|
| Pennsylvania | 185 |
| New Jersey | 58 |
| Delaware | 2 |
| Maryland | 25 |
| Virginia | 3 |
| New York | 10 |
| District of Columbia | 13 |

The American Stores Company of Virginia operated five stores served by warehouses in Baltimore, Maryland and Washington, D. C. Two of the four stores in West Virginia, operated by the American Stores Company of West Virginia, were served by warehouses in Baltimore, Maryland, and Johnstown, Pennsylvania.

Mention may be made of the fact that Acme Markets, Inc., had no warehouses or bakeries, coffee plants or canneries, of its own. During 1939 the bakeries, coffee-roasting plant, and canneries of the defendant furnished the stores operated by Acme Markets, Inc., with their requirements. The purchasing department of American Stores Company "bought merchandise in 'pool' quantities and out of the 'pool' the requirements of the three wholly-owned subsidiaries were met". The merchandise so purchased was not earmarked or segregated in the warehouses for the wholly-owned subsidiaries.

It was testified that many of the defendant's main office workers in Philadelphia were employed in connection with matters which concerned the warehouses, bakeries, trucks, etc., involved in supplying the requirements of the wholly-owned subsidiaries. Employees in the repair and mechanical shops in Philadelphia were concerned with the repair of equipment used in interstate commerce or in the production of goods for interstate commerce.

Reference may also be made to the American Stores Produce Company, a Delaware corporation and a wholly-owned subsidiary of the defendant, engaged in the produce business in Minnesota. It has its own employees, none of whom are engaged by the defendant, and the business of this subsidiary is conducted by its own employees. The same situation prevails with respect to American Stores Dairy Company, a Delaware corporation, engaged in the dairy business in Wisconsin; and also with respect to the United States Coffee Corporation, a Delaware corporation, engaged in the coffee business in Pereira, Columbia.

The defendant makes its contention that it is a single retail establishment despite the fact that it treats not only its subsidiaries but also each and every one of its 2,300 retail stores as separate establishments. The identity and operation of each store is separate and distinct. As previously pointed out, the profit or loss of each store is computed periodically and each store bears its own expenses.

The defendant in its brief (p. 13) has summarized its position as follows: " * * * The retail establishment of the defendant is the entire business of the defendant including its main offices, its warehouses, its bakeries, its multigraphing plant, its printing plant, its manufacturing operations, its transportation facilities and its repair and machine shops. It takes all of these to make the retail establishment known as the American Stores Company, and it is impossible to point out any one store, warehouse, bakery, etc., and say that that is the American Stores Company or that that is the retail establishment mentioned in the Act. The retail establishment in the Act is and can only be the entire business of the American Stores Company, which business is primarily the selling of foods, groceries, meats, fruits, vegetables, produce, etc., to the public for consumption at retail, and all manufacturing, baking, laundering, processing, bottling, cooking, blending, storing, inspecting, sorting, printing and transporting which the Company does is merely incidental to the retail business in which it is engaged."

I cannot subscribe to the defendant's view. To do so would be to do indescribable violence to the word "establishment" in section 13(a) (2).

It does not follow that because a unit of an enterprise is a component or necessary part of that enterprise, that it is to be so regarded as part and parcel of the whole enterprise as to lose its individual and separate identity as an establishment.

For example, in Bubb v. Missouri, K. & T. R. Co., 89 Kan. 303, 131 P. 575, the defendant railroad company maintained a separate building as a carpenter shop, which contained lathes, planing and boring machines, and other machinery on which lumber was sawed and converted into proper forms for mold patterns, etc. The court held that the carpenter shop was a "manufacturing establishment" within the meaning of the Factory Act requiring the guarding of machinery, even though the establishment was maintained as a mere incident to the railroad's business and the manufactured product was used by the railroad itself and not sold. Said the court in that case (89 Kan. at page 305, 131 P. at page 576):

"It has become the custom in many industries to maintain manufacturing departments for the production of articles essential to the conduct of the main business, which may be quite remote from manufacturing. * * * An establishment maintained for this purpose is as much a manufacturing establishment as if it were a distinct and separate enterprise. The statute concerns itself with labor condi-

tions and not with the destination of products, and whoever sets up an establishment of the character defined by the statute, whether the manufactured article be designed for his own consumption or use or not, must safeguard his workmen in the manner prescribed or suffer the penalty." See, also, Truman v. Kansas City, M. & O. R. Company, 98 Kan. 761, 161 P. 587.

Unquestionably the defendant operates as an integrated business. The present litigation results from its insistence that as an integrated business it must be regarded as a single "retail establishment" within the meaning of section 13(a) (2).

In Fleming v. A. B. Kirschbaum Co., supra, the United States Circuit Court of Appeals for this Circuit ruled that "typical retail establishments are grocery stores, drug stores, hardware stores and clothing shops". To the same effect was Wood v. Central Sand & Gravel Co., supra, in which the court, in disposing of the defendant's contention that a large building material and supply company was not a "retail establishment", said (33 F.Supp. at page 47): "In plain English, Webster's New International Dictionary, Second Edition, Unabridged, defines 'retail' as 'the sale of commodities in small quantities or parcels', and 'wholesale' as 'the sale of goods by the piece or in large quantities'."

I can find no basis for rejecting the commonly accepted definition of "retail establishment" and substituting for it the definition of the defendant. As has been pointed out, the Act being remedial and section 13(a) (2) being an exemption, the burden rests upon the defendant to prove that it comes within the exemption. It has failed to meet that burden.

■ In consonance with what has been stated, I am of the opinion that the defendant is not exempt as a "retail establishment" under the provisions of section 13(a) (2) of the Act.

The defendant frankly admitted in its reply brief (pp. 11, 12) that unless its contention for exemption under section 13(a) (2) is sustained, that employees in warehouses, manufacturing and processing plants, bakeries, and maintenance and repair shops, etc., which service stores outside of the state in which they are located, and employees at the main office whose work is involved with their administration, are entitled to the benefits of the provisions of sections 6 and 7 of the Act.

That brings me to the remaining contention of the defendant, that its warehouses in Newark, Orange, Syracuse and Wilkes-Barre are not subject to the provisions of the Act on the ground that they do not serve stores outside of the states in which they are located, and thus are not engaged in interstate commerce or in the production of goods for commerce.

■ That contention, too, cannot be sustained. The test to be applied as to whether or not employees come within the scope of the Act is the nature of their employment, not the nature of their employer's business. A number of recent cases have failed to recognize this fact, and in their disposition the courts have devoted themselves to consideration of the character of the employer's business rather than to the nature of the employee's services.

In Fleming v. A. B. Kirschbaum Co., supra, the United States Circuit Court of Appeals for this Circuit, in discussing the provisions and applicability of sections 6 and 7 of the Act, said:

"* * * In our view neither the language used in Sections 6 and 7 nor the legislative history of those sections furnish any support for the position taken by the defendant that the coverage of the act is dependent upon the character of the employer's business. Section 6(a) reads: 'Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce' wages at a specified rate. Here there is no limitation upon the universality of the class of employers based upon the nature of the employer's business. On the contrary the expression 'every employer' is all embracing and includes within its scope employers whose business is not in commerce[1] and who produce nothing for commerce[2] *It is the employee's work which must be in commerce or, in*

---

"[1] The word 'commerce' as used in the act is defined by Section 3(b) to mean trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof. 29 U.S.C.A. § 203(b). It is used in the same sense in this opinion.

"[2] When Congress intended to exclude from coverage on the basis of the employer's business it did so in express terms in Section 13(a) of the act and did not leave the matter to inference or conjecture." (Emphasis supplied.)

the alternative, in the production of goods for commerce. Equally clear and unambiguous is the language of section 7(a) which reads: 'No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce' for a workweek longer than the prescribed number of hours unless he pays the employee at a fixed overtime rate. The phrase 'No employer' certainly may not logically be qualified as meaning 'no employer who is engaged in commerce or in the production of goods for commerce' which is the construction urged by the defendant. *The emphasis in both sections is clearly placed upon the nature of the employee's work.*

"*That the phraseology used was deliberately chosen by Congress and aptly expresses its intention to make coverage dependent upon the work done by the employee and not upon the nature of the employer's business is indicated by the legislative history of the sections.* * * *"

To the same effect see Jax Beer Co. v. Redfern, 5 Cir., December 10, 1941, 124 F.2d 172. Said the court: "Sections 6(a) and 7(a) * * * provide that employers shall pay specified minimum wages and overtime to each of their employees 'who is engaged in commerce or in the production of goods for commerce'. *These words make application of the minimum wage and maximum hour provisions of the act dependent upon the nature of the work performed by the particular employee, and not upon the fact that the business of the employer may in some manner 'affect commerce'.* This interpretation would appear to be the one intended by Congress when it enacted the law." (Emphasis supplied.)

The United States Circuit Court of Appeals, Tenth Circuit, in Jewel Tea Co. v. Williams, 118 F.2d 202, specifically pointed out that the legislative history of the Act clearly discloses that the test to be applied is the nature of the employment of the employee and not the character of the business of the employer. Of particular interest is the reference in the opinion of the court, in discussing the Act's legislative history, to the statement of Senator Pepper of Florida, a member of the Conference Committee which drafted the Act as adopted. Said Senator Pepper (118 F.2d at page 206):

"'I want it distinctly stated that this proposed law is not applicable to all employees of an industry which itself is engaged in interstate commerce. *It is applicable only to those employees who themselves are engaged either in interstate commerce, or the production of goods for interstate commerce, and the contrary theory was definitely rejected by the Committee.*' 83 C.R. 9168 (Senate—75th Cong., 3rd Sess., June 14, 1938)." (Emphasis supplied.)

See, also, Klotz v. Ippolito, D.C., 40 F. Supp. 422, 426, which recognized that the test to be applied was the nature of the employment.

In Interpretative Bulletin No. 6 of the Wage and Hour Division, previously adverted to, this statement is made: "4. It should be noted that the test prescribed in sections 6 and 7 is related to the *nature of employment of the particular employee.* The criterion used in section 13(a) (2), on the other hand, is based upon the nature of the business conducted by the employer. *Thus, under sections 6 or 7 some employees of a given industry or of a given employer may be covered and others may not be covered* * * *." (Emphasis supplied.)

Determination of the applicability of the Act as to the defendant's employees at its Newark, Orange, Syracuse and Wilkes-Barre warehouses rests, then, upon the ascertainment of the nature of their services; i. e., whether they are engaged in interstate commerce or in the production of goods for commerce.

The parties have stipulated (Art. II, par. 1, Stipulation) as follows: "1. The operations, functions and other activities of the defendant at its warehouses at Wilkes-Barre, Pennsylvania, and Syracuse, New York, are similar to the operations, functions and other activities of the defendant at its warehouse located at Orange, New Jersey; and the duties, functions and activities of the defendant's employees employed at said warehouses at Wilkes-Barre, Pennsylvania, and Syracuse, New York, are similar to the duties, functions and activities of the defendant's employees employed at said warehouse at Orange, New Jersey; and any finding by the court respecting the defendant's warehouse at Orange, New Jersey, or its employees, shall be applicable also to the defendant's warehouses at Wilkes-Barre, Pennsylvania, and Syracuse, New York, or their employees."

It becomes necessary, therefore, to discuss very briefly only the operation of warehouse No. 7 at Orange and, so far as the evidence discloses, the nature of the services of its employees.

The Orange warehouse is a typical grocery distributing plant. No processing or manufacturing is done there. Its physical facilities include a large, four-story building; a siding on the Lackawanna Railroad, which it adjoins; truck loading and unloading platforms; elevators; refrigerated space; floor space, and office facilities. At the railroad siding three cars can be unloaded simultaneously; the truck platforms can accommodate eighteen trucks at one time. A branch of the Orange warehouse located at Newark distributes fresh fruits and vegetables, meats and bakery products. The Newark warehouse has a siding on the Pennsylvania Railroad, with a capacity of four cars, and platforms adequate for ten or twelve trucks. Food and grocery products handled by warehouse No. 7 come to Orange from all sections of the country. Approximately 93 per cent of the products passing through the Orange and Newark warehouses originate outside the State of New Jersey from all parts of the United States. Goods are unloaded from freight cars and trucks and brought into the warehouses where they are stacked. Incoming merchandise is recorded by receiving clerks. The value of the goods received by warehouse No. 7 during 1939 was $6,-464,449. In 1939 warehouse No. 7 unloaded approximately 504 freight car shipments of goods received from outside the State of New Jersey, and during the same year the Orange warehouse received approximately 36 weekly truck shipments from outside the State of New Jersey.

Warehouse No. 7 in 1939 served 172 retail stores in the State of New Jersey. Of these 172 stores, 58 were operated by the Acme Markets, Inc., and the balance by the defendant directly.

Less than one per cent of the products of warehouse No. 7 were shipped outside of the State of New Jersey.

Warehouse No. 7 (Orange) employs 86 employees in the following classifications:

| | |
|---|---|
| Office | 39 |
| Shipping | 41 |
| Butter & Egg | 5 |
| Miscellaneous | 1 |

Warehouse No. 7 (Newark) employs 30 employees in the following classifications:

| | |
|---|---|
| Produce | 20 |
| Meat | 10 |

The total payroll for 1939 was $90,993.-44.

The testimony and the voluminous exhibits did not disclose in sufficient detail the exact duties discharged by the various office employees to enable me to state with any particularity the nature of their employment. The only information evidenced by the record with reference to the office employees was that incoming merchandise was recorded by receiving clerks and outgoing by checkers, and that the records of incoming and outgoing merchandise, together with inventories, were made up at the warehouses. These receiving clerks, and all other office employees who performed any services in the recording of incoming shipments, are subject to the provisions of the Act.

As to the 41 employees engaged in "shipping", the record discloses that they all handled incoming as well as outgoing shipments, and they come within the provisions of the Act.

In this connection it must be noted that there was no segregation of employees whose work related to shipments of goods originating outside the State of New Jersey, as distinguished from shipments of goods which originated within the State of New Jersey (Exhibit p-63).

Maintenance men, watchmen, and janitors, and all those employed in the maintenance and operation of the warehouse building, are subject to the provisions of the Act. Fleming v. A. B. Kirschbaum Co., supra.

Employees of the warehouse who are engaged solely in connection with the work of the retail stores directly operated by the defendant are exempt, since they are neither engaged in interstate commerce or in the production of goods for interstate commerce.

Employees who are engaged in connection with the operation of the 58 stores of Acme Markets, Inc., of Delaware are not exempt, since the Acme was a separate corporate entity and operated as such, and all the operations of the warehouse employees who performed any serv-

ices with respect to these Acme stores were in interstate commerce.

Keeping in mind that the applicability of the Act depends upon the nature of the employment, I cannot for that reason make any ruling with respect to the individual employees whose services were not described by the testimony or alluded to in the exhibits. That must be left to subsequent determination by the parties in consonance with this opinion. All employees who rendered services in connection with incoming goods (whether in the actual physical handling of the goods or in the compilation of records or other operations pertaining to incoming goods) are subject to the provisions of the Act. This also applies to all employees who performed any duties in connection with the operation or servicing of the 58 Acme-owned stores.

In summary and in conclusion I make the following disposition of the issues presented by this litigation:

(1) The defendant is not a "retail establishment" within the provisions of section 13(a) (2) of the Fair Labor Standards Act, and hence is subject to the provisions of sections 6 and 7 of the Act;

(2) The · defendant's contention that warehouses which service only stores in the state in which they are located are engaged in intrastate commerce, and therefore are not subject to the provisions of the Act, cannot be sustained since coverage of sections 6 and 7 of the Act is dependent upon the nature of the services performed by the employee and not upon the character of the employer's business.