## REYNOLDS et al. v. SALT RIVER VALLEY WATER USERS ASS'N.

### No. 10618.

Circuit Court of Appeals, Ninth Circuit.

June 30, 1944.

Concurring Opinion July 19, 1944.

864

Langmade & Langmade, of Phoenix, Ariz., for appellants.

Sloan, Scott & Green and Greig Scott, all of Phoenix, Ariz., for appellee.

Douglas B. Maggs, Sol., Archibald Cox, Associate Sol., Bessie Margolin, Asst. Sol., Dept. of Labor, all of Washington, D. C., and Dorothy M. Williams, Regional Atty. and Willard S. Johnston, Atty., Dept. of Labor, both of San Francisco, Cal., for Administrator of Wage and Hour Division, U. S. Dept. of Labor, as amicus curiae.

Before DENMAN, MATHEWS, and STEPHENS, Circuit Judges.

DENMAN, Circuit Judge.

Appellants, plaintiffs below, are employed in Arizona by appellee corporation, in one or another of the capacities of conducting through irrigation canals and ditches, which they also maintain, and distributing and delivering water for the irrigation of appellee's shareholders' otherwise unproductive lands for the production of vegetables and other agricultural products largely shipped in interstate commerce and of pumping part of the water for such irrigation. They claimed they were paid less than the minimum wage and worked more than the maximum hours required by Sections 6 and 7 of the Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 206, 207, hereinafter called the Act, and sued below for the additional compensation and an equal amount of liquidated damages as provided in that Act. They appeal from a judgment based upon the following conclusions of law:

"1. That in the performance by plaintiffs, and each of them, of the services for defendant Association, mentioned in their complaint herein, and as shown by the evidence, none of said plaintiffs, during said period of time, were engaged in commerce, or the production of goods for commerce, or in any occupation necessary to the production thereof, within the meaning of said Act.

"2. That in the carrying on of its said business and operations, as aforesaid, defendant Association was a service establishment, the greater part of whose service is in intrastate commerce, and by reason thereof plaintiffs, and each of them, are exempted from the provisions and benefits of said Act.

"3. That the plaintiffs employed by defendant Association in the capacity of zanjeros are outside salesmen within the meaning of said act, and exempted from the provisions and benefits of said Act."

We do not agree with any of these conclusions of law from the facts adduced, up-

on which there is no substantial conflict. (A) Appellee corporation is not a service establishment within section 13(a) 2 of the Act, 29 U.S.C.A. § 213(a) (2); (B) appellant employees were engaged in the production of products for interstate commerce within sections 6 and 7 of the Act; and (C) the zanjeros, acting under the requisition of appellee's shareholders in the distribution and delivery to the latter of water serving their lands, are not "outside salesmen" within the exemption of section 13(a) (1) of the Act and no sales of water are made or aided by them.

## A. *Appellee is not a service establishment.*

Appellee operates a water and electric system for the supply of irrigation water and power in central Arizona, which consists of five large storage dams, two diversion dams, eight hydroelectric plants, one steam plant, one Diesel plant, 1400 miles of canals and laterals, hundreds of miles of power lines, two hundred deep well pumps, and other plant and equipment necessary for the operation of a water and electric utility. These works extend over a great area; the lands served by appellee's water themselves comprise approximately 250,000 acres. Appellee's investment in power plants approximates $23,000,000. During the twelve months' period involved in this case appellee generated at its power plants 408,779,430 kilowatt-hours of electricity. The water is supplied to farms. Forty percent of the power is supplied to copper mining companies for use in their mines.

Appellee obtains the bulk of its water both for irrigation and for the generation of power from the Salt and Verde Rivers. Its shareholders are farmers in the Salt River Valley. They or their predecessors in interest appropriated and so became entitled to the use of the water in the Salt and Verde Rivers for the irrigation of their lands which would otherwise be arid and unproductive. Prior to the organization of appellee, this water was distributed to the farmers by a number of canal companies.

Appellee was organized for the purpose of unifying these projects and thus conserving all possible water and distributing it to the farmers more effectively than before. One share of appellee's stock was issued for each acre of land in the project. The stock is appurtenant to the land and passes therewith.

With federal assistance and in furtherance of its purposes, appellee has augmented its work and, to harness the water power, has constructed hydroelectric plants for the generation of electricity. The right to the use of the water, however, remains in appellee's shareholders—the farmers in the Salt River Valley who require and are by law entitled to it for the irrigation of their lands—and appellee is charged with the obligation to hold this water for, and deliver it to them in proportion to their interests subject only to their paying assessments in advance of delivery in order to defray appellee's costs and expenses.

The water, therefore, is allowed to flow only in accordance with the demands of the shareholders, and appellee makes no independent disposition of it. As the water is called for by the shareholders, appellee guides its flow from the rivers and reservoirs through its hydroelectric plants (thereby generating electricity) and on down through the network of canals, laterals and ditches to the shareholders. Thus the demand for, and distribution of, water also determines the production of electricity; in other words, the electricity is generated at the hydroelectric plants only as appellee delivers water to its shareholders. Appellee's water and electric system constitutes a single coordinated enterprise based primarily upon the use of the water of the Salt and Verde Rivers.

To augment this supply, however, appellee pumps underground water into its canals and laterals, and distributes it to the shareholders for irrigation. Appellee's pumps are operated by electricity, a portion of which it receives from out of the state, and the remainder of which it generates.

Appellee claims and the district court held that in the performance of the above functions appellee is a "service establishment" within section 13(a) (2) of the Act exempting from the minimum wage and hours provisions (sections 6 and 7) of the Act "(2) any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce."

This court has considered the legislative history of this exemption. Its purpose is to exempt neighborhood merchants serving the consuming public who might otherwise be covered due to their location near a state line. Walling v. Block,

9 Cir., 139 F.2d 268, Cf. Walling v. Jacksonville Paper Co., 317 U.S. 564, 571, 63 S.Ct. 332, 87 L.Ed. 460; Walling v. American Stores Co., 3 Cir., 133 F.2d 840; Fleming v. A. B. Kirschbaum Co., 3 Cir., 124 F.2d 567. The courts have held uniformly that the exemption applies only to establishments of a retail character engaged in selling goods or services or both, such as grocery stores, filling stations, barber shops, and beauty parlors; and that the exemption is inapplicable to water and electric companies such as appellee. Walling v. A. B. Kirschbaum Co., 3 Cir., 124 F.2d 567; Bracey v. Luray, 4 Cir., 138 F.2d 8; Guess v. Montague, 4 Cir., 140 F.2d 500; Collins v. Kidd Dairy & Ice Co., 5 Cir., 132 F.2d 79; Sun Publishing Co. v. Walling, 6 Cir., 140 F.2d 445; Schmidt v. Peoples Telephone Union of Marysville, 8 Cir., 138 F.2d 13; Walling v. Peoples Packing Co., 10 Cir., 132 F. 2d 236; Wood v. Central Sand & Gravel Co., D.C.Tenn., 33 F.Supp. 40, 47.

Appellee with its 1400 miles of canals and laterals, 5 storage dams, 2 diversion dams, 8 hydroelectric plants, steam plant, Diesel plant, hundreds of miles of power lines, 200 deep well pumps, and other plants and equipment is not a "service establishment."

■ B. Appellee's employees engaged in pumping and directing the flow of water for the irrigation of its stockholders' lands are "engaged in the production of goods" for interstate commerce, since such supplying of water is a "process" and an "occupation necessary to the production" of such goods as defined in section 3(j) of the Act, 29 U.S.C.A. § 203(j).[1] More particularly, appellee's maintenance employees are engaged in maintaining, cleaning, and repairing the canals, laterals, and ditches through which the water flows to irrigate the farms. These employees mow and burn noxious grasses and weeds which, if permitted to grow without restraint, would clog the canals, laterals and ditches and stop the vital flow of water. In their work they operate draglines, bull dozers, dredges, shovels, mowers, burners and other necessary machines. They also perform repair work upon the head gates, weirs, and other physical equipment which controls the flow of the water through appellee's works.

The pump men operate and service the electric pumps which draw from underground the water to be delivered to appellee's shareholders in addition to the water obtained from the Salt and Verde Rivers. Whenever these employees switch on the pumps they cause electricity, including electricity originating ouside the State of Arizona, to flow through appellee's lines. Thus these employees, in addition to supplying water to appellee's shareholders, are engaged in bringing electricity into the state.

■ This court takes judicial notice of the fact that the rainfall in the area irrigated by the water so supplied is so scant that, absent irrigation, that area would produce but a very small fraction of its present products. These are such as are admitted by appellee's answer below to one of appellants' interrogatories to have been produced by its shareholders in the year 1941. It is not questioned that in large part these products were intended for shipment and were shipped in interstate commerce. They were

| | | |
|---|---|---|
| "Citrus | 112,259,520 | lbs. |
| Lettuce, spring | 1,763,365 | crates |
| Lettuce, fall | 1,087,125 | crates |
| Beets, sugar | 5,669,892 | lbs. |
| Cantaloupes | 925,600 | crates |
| Broccoli, Cabbage, Carrots, Cauliflower, Watermelons — On 1941 Crop Report as Truck Miscellaneous.... | 69,993,600 | Lbs. |
| Cotton, short | 30,980 | lbs. |
| Cotton, long | 8,145.45 | bales" |

[1] "(j) 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."

Appellee did not make the affirmative plea that its employees were "employed in agriculture" within the exemption of section 13(a) (6) of the Act. That question was not raised here or in the court below. It is a question which well may affect the practice and rulings of the Wages and Hours Division of the Department of Labor in the performance of its functions under the Act. "Our decision is without prejudice to the disposition of the question wherever appropriately presented." Blair v. Oesterlein, 275 U.S. 220, 225, 48 S.Ct. 87, 89, 72 L.Ed. 249.

We are unable to agree with the suggestion that if the persons supplying water, so plainly a "process" and an "occupation necessary to the production" of such products, are deemed within the Act then so would be included the persons engaged in the necessary but prior step of the manufacture of ploughshares and harness for plow horses or tractors sold to the farmers.

As in all such broad statutory enactments regulating processes and conduct, there is a borderline between remote and immediate participation. Here the irrigating water is not only a causa sine qua non but one of the several proximate causes of vegetable growth. Its intimate immediacy is obvious. Quantitatively, the major content of these cantaloupes, watermelons, lettuce, cabbage, broccoli, and carrots is the water which has been in part pumped for and all of it directed toward the plant roots by the appellee's employees.

We can see no difference between appellants lifting the water vertically and directly it laterally toward the plant roots which channel it into the vegetable itself, and the mechanics who supply pieces of metal into the channels of a machine which automatically manufactures pens or pins or wire clips. Appellants' participancy certainly is as intimate as that of the engineers, firemen and electricians of the buildings which housed the tenants engaged in the manufacture of goods for interstate commerce. A. B. Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 1118, 86 L.Ed. 1638.[2] There the Supreme Court said:

"The engineer and the firemen produce heat, hot water, and steam necessary to the manufacturing operations. They keep elevators, radiators, and fire sprinkler systems in repair. The electrician maintains the system which furnishes the tenants with light and power. * * * Without light and heat and power the tenants could not engage, as they do, in the production of goods for interstate commerce. The maintenance of a safe, habitable building is indispensable to that activity. * * * In our judgment, the work of the employees in these cases had such a close and immediate tie with the process of production for commerce, and was therefore so much an essential part of it, that the employees are to be regarded as engaged in an occupation 'necessary to the production of goods for commerce'."

We hold that appellee's maintenance and pumpmen are engaged in the production of goods for interstate commerce.

■ C. The zanjeros likewise were engaged in the production of such goods. They are not "outside salesmen" within section 13(a) (1) of the Act.

The zanjeros from day to day receive instructions from appellee's shareholders to deliver specified quantities of the water to which the shareholders are entitled. A zanjero may receive instructions from as many as twenty shareholders a day. Approximately one each day the zanjero communicates with other employees of appellee by telephone and tells them how much water is required that day by the shareholders in his territory. These other employees thereupon release from storage sufficient water to fill the total demands and inform the zanjero of the time and place at which the water will reach canals within his territory. Upon receipt of sufficient water the zanjero, by setting controls and forebays, opening head gates, measuring water and closing head gates, routes the water from the main canal into and through the intermediate canals, laterals and ditches under his supervision on to each of the shareholders whose demands he is filling. They, as the pumpers and maintenance men, are engaged in the production of goods for interstate commerce.

Section 13(a) (1) exempts from the wage and hour provisions any employee employed in "the capacity of outside salesmen (as such terms are defined and delimited by regulations of the Administrator)." The pertinent regulation issued by the Administrator provides,

"The term 'employee employed * * * in the capacity of outside salesman' in section 13(a) (1) of the act shall mean any employee—

"(A) who is employed for the purpose of and who is customarily and regularly engaged away from his employer's place or places of business in (1) making sales within the meaning of section 3(k) of the act;

---

[2] Cf. Warren-Bradshaw Drilling Co. v. Hall, 317 U.S. 88, 91, 63 S.Ct. 125, 87 L.Ed. 83; Hargrave v. Mid-Continent Pipe Line Co., 10 Cir., 129 F.2d 655; Walton v. Southern Package Corp., 320 U.S. 540, 542, 64 S.Ct. 320; Consolidated Timber Co. v. Womack, 9 Cir., 132 F.2d 101; Walling v. Sondock, 5 Cir., 132 F. 2d 77.

or (2) obtaining orders or contracts for the use of facilities for which a consideration will be paid by the client or customer, and

"(B) whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the workweek by such nonexempt employees; provided that work performed incidental to and in conjunction with the employees' own outside sales or solicitations, including incidental deliveries and collections, shall not be regarded as nonexempt work."

Appellee's brief admits that: "Appellee, itself, has, [no] and under the law of Arizona cannot acquire, any title to or interest in the water developed by it and delivered to the lands of its shareholders. Its only interest therein is the development, storage and making available of such water to those entitled thereto for the irrigation of their lands." Since appellee has no water to sell it cannot employ salesmen as water sellers or aides to water sales.

In performing the function above described, the zanjeros are not "obtaining orders or contracts for the use of [appellee's] facilities." The shareholder's right to the use of appellee's facilities is intrinsic in his shareholder's status in the association. It is the shareholder's right to direct the corporate employees to distribute the water to the shareholder's land. The zanjero who is directed by the shareholder to deliver a certain amount of water to his land is "ordered" to do so, but is not obtaining an order for the corporation by solicitation or otherwise.

■ Even assuming, contra to the fact, that in acting on the shareholder's direction there is obtained an order within the meaning of the regulation, appellee, seeking an exemption from the Act,, has not maintained its burden of proof[3] that the zanjeros receive their orders, an many as twenty a day for a single zanjero, while they are "customarily and regularly engaged away from their employer's place or places of business." On the contrary, the likely condition is that the zanjero received them by telephone at his home or an office and did not solicit them by making daily rounds of the farms within his territory.

The judgment is reversed.

MATHEWS, Circuit Judge (concurring in the result).

I concur in the result, but do not concur in all that my associates (Judges DENMAN and STEPHENS) say in their opinion.

After pointing out, correctly, that appellee's shareholders have a right to the water used by appellee for the generation of electricity, my associates say: "The water, therefore, is allowed to flow only in accordance with the demands of the shareholders * * *. As the water is called for by the shareholders, appellee guides its flow from the rivers and reservoirs through its hydroelectric plants (thereby generating electricity) and on down * * * to the shareholders. Thus the demand for, and distribution of, water also determines the production of electricity; in other words, the electricity is generated at the hydroelectric plants only as appellee delivers water to its shareholders." The quoted statements are incorrect. Water delivered to appellee's shareholders may be, and is ordinarily, used for the generation of electricity long before, and several times before, delivery thereof is made or called for.

After pointing out, correctly, that appellee's shareholders produce cantaloupes, watermelons, lettuce, cabbage, broccoli, carrots and other vegetables, my associates say: "Quantitatively, the major content of these cantaloupes, watermelons, lettuce, cabbage, broccoli and carrots is the water which has been in part pumped for and all of it directed toward the plant roots by the appellee's employees." This, if true, is immaterial. Our holding that appellants are engaged in the production of goods for commerce, within the meaning of the Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 201–219, should not depend, or seem to depend, upon the water content of vegetables produced by appellee's shareholders.

My associates say: "We are unable to agree with the suggestion that if the persons supplying water * * * are deemed within the Act then so would be included the persons engaged in the * * * manufacture of ploughshares and harness for plow horses or tractors sold to the farmers." I am not aware of any such suggestion and hence do not feel called upon to agree or disagree therewith.

---

[3] Bowie v. Gonzales, 1 Cir., 117 F.2d 11, 16; Fleming v. Hawkeye Pearl Button Co., 8 Cir., 113 F.2d 52, 56; Fleming v. American Stores Co., D.C.E.D.Pa., 42 F.Supp. 511, 517.

My associates say: "We can see no difference between appellants lifting the water vertically and directing it laterally toward the plant roots which channel it into the vegetable itself, and the mechanics who supply pieces of metal into the channels of a machine which automatically manufactures pens or pins or wire clips." I know nothing of any such mechanics. If any such exist, we are not concerned with them and have no occasion to compare them with appellants.

The judgment should be reversed.